IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

| COALITION FOR RENEWABLE NATURAL GAS,<br><br>Petitioner,<br><br>v.<br><br>UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,<br><br>Respondent. | Case No. 25-1183 |
|---|---|

**PETITION FOR REVIEW**

Under Rule 15 of the Federal Rules of Appellate Procedure and Section 307(b) of the Clean Air Act, 42 U.S.C. § 7607(b), the Coalition for Renewable Natural Gas (RNG COALITION) hereby petitions this Court for review of final agency action by the U.S. Environmental Protection Agency (EPA) entitled, "Renewable Fuel Standard (RFS) Program: Partial Waiver of the 2024 Cellulosic Biofuel Volume Requirement," published at 90 Fed. Reg. 29,751 (July 7, 2025). This challenge is properly before the D.C. Circuit and is timely under 42 U.S.C. § 7607(b).

A copy of the final agency action is attached to this petition.

Dated: September 4, 2025

Respectfully submitted,

*/s/ Jonathan Y. Ellis*

Jonathan Y. Ellis
Grace Greene Simmons
McGuireWoods LLP
888 16th St. N.W.
Suite 500
Washington, D.C. 20006
(202) 828-2887
*jellis@mcguirewoods.com*
*gsimmons@mcguirewoods.com*

Sandra P. Franco
Franco Environmental Law, LLC
600 Pennsylvania Avenue, SE
Unit 15577
Washington, DC 20003
(202) 256-6115
*sandra@francoenvironmentallaw.com*

*Counsel for Coalition for Renewable Natural Gas*

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| COALITION FOR RENEWABLE NATURAL GAS,<br><br>Petitioner,<br><br>v.<br><br>UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,<br><br>Respondent. | Case No. 25-1183 |

**RULE 26.1 CORPORATE DISCLOSURE STATEMENT**

Under Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, the Coalition for Renewable Natural Gas (RNG COALITION) makes the following disclosure:

RNG COALITION has no parent companies, and no publicly held company has a 10% or greater ownership interest. It has not issued shares or debt securities to the public.

RNG COALITION is a non-profit association of companies and organizations dedicated to the advancement of renewable natural gas as a clean, green, alternative, and domestic energy and fuel resources. It advocates on behalf of its members and provides education for the public in support of

the sustainable development, deployment, and utilization of renewable natural gas, including participating in regulatory proceedings and litigation involving implementation of the Renewable Fuel Standard program by EPA, as well as other regulatory actions that may impact the renewable natural gas industry. RNG COALITION's membership includes companies throughout the value chain of waste feedstock conversion to transportation fuel under the Renewable Fuel Standard program. RNG COALITION is a "trade association" as defined in Circuit Rule 26.1(b).

Dated: September 4, 2025

Respectfully submitted,

*<u>/s/ Jonathan Y. Ellis</u>*
Jonathan Y. Ellis
Grace Greene Simmons
McGuireWoods LLP
888 16th St. N.W.
Suite 500
Washington, D.C. 20006
(202) 828-2887
*jellis@mcguirewoods.com*
*gsimmons@mcguirewoods.com*

Sandra P. Franco
Franco Environmental Law, LLC
600 Pennsylvania Avenue, SE
Unit 15577
Washington, DC 20003
(202) 256-6115
*sandra@francoenvironmentallaw.com*

*Counsel for Coalition for Renewable Natural Gas*

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| COALITION FOR RENEWABLE NATURAL GAS,<br><br>Petitioner,<br><br>v.<br><br>UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,<br><br>Respondent. | Case No. 25-1183 |

## CERTIFICATE OF SERVICE

Under Rule 25(d) of the Federal Rules of Appellate Procedure, I hereby certify that I caused the foregoing Petition for Review and Rule 26.1 Statement to have been served by United States first-class mail this 4th day of September, 2025 upon each of the following:

Hon. Lee Zeldin
Administrator
U.S. ENVIRONMENTAL PROTECTION AGENCY
1200 Pennsylvania Ave. N.W.
Mail Code: 1101A
Washington, D.C. 20460

Correspondence Control Unit
Office of General Counsel
U.S. ENVIRONMENTAL PROTECTION AGENCY
1200 Pennsylvania Ave. N.W.
Mail Code: 2310A
Washington, D.C. 20460

Hon. Pam Bondi
Attorney General
Adam Gustafson
Acting Assistant Attorney General
U.S. DEPARTMENT OF JUSTICE
950 Pennsylvania Ave. N.W.
Washington, D.C. 20530

I have also caused an electronic copy (including a copy of the Federal Register notice) to be provided via electronic mail to Kimere J. Kimball (*kimere.kimball@usdoj.gov*).

Dated: September 4, 2025

*/s/ Jonathan Y. Ellis*
Jonathan Y. Ellis





(b) * * *

(4) Control of landfill gas emissions from existing municipal solid waste landfills, submitted by the Oklahoma Department of Environmental Quality on April 30, 2024.

* * * * *

■ 3. Revise § 62.9160 to read as follows.

**§ 62.9160 Oklahoma Department of Environmental Quality.**

(a) *Identification of plan.* Control of air emissions from existing municipal solid waste landfills, as adopted by the State of Oklahoma on February 18, 2022, effective September 15, 2022, and submitted on April 30, 2024, by the Oklahoma Department of Environmental Quality (ODEQ) Air Quality Division Director in a letter dated April 29, 2024. The plan includes the regulatory provisions cited in paragraph (d) of this section, which EPA incorporates by reference.

(b) *Identification of sources.* The plan, as adopted by the State of Oklahoma on February 18, 2022, effective September 15, 2022, and submitted on April 30, 2024, applies to existing municipal solid waste landfills subject to the Municipal Solid Waste Landfills Emission Guidelines, at 40 CFR part 60, subpart Cf, within its jurisdiction in the State of Oklahoma.

(c) *Effective Date.* The effective date of the plan is August 6, 2025.

(d) *Incorporation by reference.* The material listed in this paragraph (d) is incorporated by reference in this section with the approval of the Director of the Federal Register under 5 U.S.C. 552(a) and 1 CFR part 51. All approved incorporation by reference (IBR) material is available for inspection at the EPA and at the National Archives and Records Administration (NARA). Contact the EPA Region 6 office at 1201 Elm Street, Suite 500, Dallas, Texas 75270; phone 214–665–2200. For information on the availability of this material at NARA, visit *www.archives.gov/federal-register/cfr/ibr-locations* or email *fr.inspection@nara.gov.* The material may be obtained from the State of Oklahoma, Secretary of State, Office of Administrative Rules, 421 NW 13th St. Suite 210, Oklahoma City, OK 73103, *oar@sos.ok.gov, https://www.rules.ok.gov/home.*

(1) Oklahoma Administrative Code (OAC) Title 252. Department of Environmental Quality, Chapter 100. Air Pollution Control, Subchapter 47. Control of Emissions from Existing Municipal Solid Waste Landfills, effective September 15, 2022.

(2) [Reserved]

[FR Doc. 2025–12599 Filed 7–3–25; 8:45 am]

BILLING CODE 6560–50–P

## ENVIRONMENTAL PROTECTION AGENCY

## 40 CFR Part 80

[EPA–HQ–OAR–2024–0411; FRL–12015–02–OAR]

RIN 2060–AW46

## Renewable Fuel Standard (RFS) Program: Partial Waiver of the 2024 Cellulosic Biofuel Volume Requirement

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Final rule.

**SUMMARY:** EPA is partially waiving the 2024 cellulosic biofuel volume requirement and revising the associated percentage standard under the Renewable Fuel Standard (RFS) program due to a shortfall in cellulosic biofuel production. This action also makes a minor revision to the biogas provisions of the RFS program.

**DATES:** This rule is effective on September 5, 2025. The incorporation by reference of certain other material listed in the rule was approved by the Director of the Federal Register as of September 11, 2023.

**ADDRESSES:** EPA has established a docket for this action under Docket ID No. EPA–HQ–OAR–2024–0411. All documents in the docket are listed on the *https://www.regulations.gov* website. Although listed in the index, some information is not publicly available, *e.g.,* confidential business information (CBI) or other information whose disclosure is restricted by statute. Certain other material is not available on the internet and will be publicly available only in hard copy form. Publicly available docket materials are available electronically through *https://www.regulations.gov.*

**FOR FURTHER INFORMATION CONTACT:** For questions regarding this action, contact Dallas Burkholder, Assessment and Standards Division, Office of Transportation and Air Quality, Environmental Protection Agency, 2000 Traverwood Drive, Ann Arbor, MI 48105; telephone number: (734) 214–4776; email address: *RFS-Rulemakings@epa.gov.*

**SUPPLEMENTARY INFORMATION:**

### Does this action apply to me?

Entities potentially affected by this action are those involved with the production, distribution, and sale of transportation fuels (*e.g.,* gasoline and diesel fuel) and renewable fuels (*e.g.,* ethanol, biodiesel, renewable diesel, and biogas). Potentially affected categories include:

| Category | NAICS [a] code | Examples of potentially affected entities |
|---|---|---|
| Industry | 211130 | Natural gas liquids extraction and fractionation. |
| Industry | 221210 | Natural gas production and distribution. |
| Industry | 324110 | Petroleum refineries (including importers). |
| Industry | 325120 | Biogases, industrial (*i.e.,* compressed, liquified, solid), manufacturing. |
| Industry | 325193 | Ethyl alcohol manufacturing. |
| Industry | 325199 | Other basic organic chemical manufacturing. |
| Industry | 424690 | Chemical and allied products merchant wholesalers. |
| Industry | 424710 | Petroleum bulk stations and terminals. |
| Industry | 424720 | Petroleum and petroleum products wholesalers. |
| Industry | 457210 | Fuel dealers. |
| Industry | 562212 | Landfills. |

[a] North American Industry Classification System (NAICS).

This table is not intended to be exhaustive, but rather provides a guide for readers regarding entities potentially affected by this action. This table lists the types of entities that EPA is now aware could potentially be affected by this action. Other types of entities not listed in the table could also be affected. To determine whether your entity would be affected by this action, you should carefully examine the applicability criteria in 40 CFR part 80. If you have any questions regarding the applicability of this action to a particular entity, consult the person listed in the **FOR FURTHER INFORMATION CONTACT** section.

**Preamble Acronyms and Abbreviations**

Throughout this document the use of ''we,'' ''us,'' or ''our'' is intended to refer to EPA. We use multiple acronyms and terms in this preamble. While this list may not be exhaustive, to ease the reading of this preamble and for reference purposes, EPA defines the following terms and acronyms here:

BBD biomass-based diesel
CAA Clean Air Act
CG conventional gasoline
CNG compressed natural gas
CWC cellulosic waiver credit
LNG liquified natural gas
RBOB reformulated gasoline before oxygenate blending
RFG reformulated gasoline
RFS Renewable Fuel Standard
RIN Renewable Identification Number
RNG renewable natural gas
RVO Renewable Volume Obligation

**Outline of This Preamble**

I. Executive Summary
II. Statutory Background
A. The RFS Program and the Set Authority
B. Cellulosic Waiver Authority
III. Partial Waiver of the 2024 Cellulosic Biofuel Volume Requirement
A. Implementation of the Cellulosic Waiver Authority
B. Economic Impact Analysis
C. Calculation of 2024 Cellulosic Biofuel Percentage Standard
IV. Change to Calculation of Cellulosic Waiver Credit Price
V. Measurement of Renewable CNG/LNG Using Documentation
VI. Severability
VII. Judicial Review
VIII. Statutory and Executive Order Reviews
A. Executive Order 12866: Regulatory Planning and Review
B. Executive Order 14192: Unleashing Prosperity Through Deregulation
C. Paperwork Reduction Act (PRA)
D. Regulatory Flexibility Act (RFA)
E. Unfunded Mandates Reform Act (UMRA)
F. Executive Order 13132: Federalism
G. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments
H. Executive Order 13045: Protection of Children From Environmental Health Risks and Safety Risks
I. Executive Order 13211: Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use
J. National Technology Transfer and Advancement Act (NTTAA) and 1 CFR Part 51
K. Congressional Review Act (CRA)
IX. Statutory Authority

**I. Executive Summary**

On July 12, 2023, EPA promulgated a rule establishing the RFS volume requirements and percentage standards for 2023–2025 (the ''Set 1 Rule'').[1] As part of that rulemaking, EPA projected that 1.09 billion cellulosic Renewable Identification Numbers (RINs) would be generated in 2024 and used that volume to establish the 2024 cellulosic biofuel percentage standard of 0.63 percent.[2] On December 12, 2024, EPA proposed a rule to, among other things, partially waive the 2024 cellulosic biofuel volume requirement under the RFS program and revise the associated 2024 cellulosic biofuel percentage standard due to a projected shortfall in cellulosic biofuel production in 2024.[3] In this action, EPA is finalizing the proposed partial waiver of the 2024 cellulosic biofuel requirement and one RFS regulatory amendment. EPA proposed several additional amendments to other RFS provisions, a majority of which are not being finalized here but may instead be addressed in a later action.

Based on cellulosic (D3/D7) RIN generation data for 2024, we now project that only 1.01 billion cellulosic RINs were generated in 2024, a shortfall of 0.08 billion RINs from the 1.09 billion RINs projected in the Set 1 Rule. Due to this shortfall and reasons further explained in Sections II and III, we are partially waiving the 2024 cellulosic biofuel volume requirement to 1.01 billion RINs (the projected cellulosic RIN generation in 2024) using the Clean Air Act (CAA) section 211(o)(7)(D) ''cellulosic waiver authority.'' In the proposal, we proposed to utilize the CAA general waiver authority to partially waive the 2024 cellulosic biofuel volume requirement and sought comment on the use of the CAA cellulosic waiver authority. After further consideration and in response to comments received, we have decided to partially waive the 2024 cellulosic biofuel volume requirement using the CAA cellulosic waiver authority. The cellulosic waiver authority is specific to the cellulosic biofuel standard and its use is mandatory, as described further in Section II.B. Use of the cellulosic waiver authority also triggers the availability of cellulosic waiver credits (CWCs) for 2024 as an additional compliance flexibility for obligated parties. As discussed further in the response to comments (RTC) document,[4] we are not reducing the 2024 cellulosic biofuel volume using the general waiver authority.

The supply of advanced biofuel and total renewable fuel in 2024 exceeded the required volumes by a significant margin, despite the shortfall in cellulosic biofuel. Given the surplus of 2024 BBD (D4) and advanced (D5) RINs, we are not reducing the volumes for any of the other categories of renewable fuel (*i.e.,* biomass-based diesel (BBD), advanced biofuel, and total renewable fuel). We are also not making any changes to any of the 2025 RFS standards, which were also finalized in the Set 1 Rule.[5]

Finally, we are also replacing the source of data for the wholesale price of gasoline that is used to calculate the price of cellulosic waiver credits (CWCs), as discussed in Section IV, as well as making a minor revision to the biogas provisions of the RFS program, as discussed in Section V.

**II. Statutory Background**

*A. The RFS Program and the Set Authority*

CAA section 211(o)(2)(B) establishes the framework by which EPA is to establish annual, nationally applicable minimum volume requirements for each of the four categories of renewable fuel that make up the RFS program: cellulosic biofuel, BBD, advanced biofuel, and renewable fuel. CAA section 211(o)(2)(B)(i) provided specific applicable volumes for cellulosic biofuel, advanced biofuel, and renewable fuel for each year from 2010 to 2022 and specific applicable volumes for BBD for each year from 2010 to 2012.

For the years beyond those expressly enumerated (*i.e.,* after 2022 for all categories), CAA section 211(o)(2)(B)(ii) provides that applicable volumes are set by EPA in coordination with the United States Department of Agriculture (USDA) and Department of Energy (DOE), based on a review of the implementation of the RFS program to date, and that EPA must analyze specific factors (*e.g.,* the impact of the production and use of renewable fuels on the environment, energy security, the infrastructure of the United States, and job creation). EPA calls this statutory authority to set volumes after 2022 its ''set authority.'' CAA section 211(o)(2)(B)(ii) additionally provides that under the set authority, EPA shall promulgate applicable volumes no later than 14 months prior to the start of the relevant year.[6]

[1] 88 FR 44468 (July 12, 2023).

[2] 40 CFR 80.1405(a).

[3] 89 FR 100442 (December 12, 2024).

[4] ''Renewable Fuel Standard (RFS) Program Partial Waiver of 2024 Cellulosic Biofuel Volume Requirement: Response to Comments Document,'' EPA–420–R–25–008, June 2025.

[5] EPA is not reopening the 2025 RFS volumes and standards in this proceeding, nor are we reopening any of the 2024 RFS volumes and standards besides the 2024 cellulosic biofuel volume and standard.

[6] ''The Administrator shall promulgate rules establishing the applicable volumes under this clause no later than 14 months before the first year for which such applicable volume will apply.'' CAA section 211(o)(2)(B)(ii).

This action concerns the 2024 cellulosic biofuel volume requirement that was established in the Set 1 Rule, EPA's first RFS rule promulgated under the set authority. In the Set 1 Rule, EPA established the volume requirements for 2023–2025 using the set authority and acknowledged that certain waivers may be available to adjust post-2022 volume requirements if the requisite statutory conditions are met.[7]

*B. Cellulosic Waiver Authority*

The cellulosic waiver authority at CAA section 211(o)(7)(D)(i) provides that ''[f]or any calendar year for which the projected volume of cellulosic biofuel production is less than the minimum applicable volume established under [CAA section 211(o)](2)(B)], as determined by the Administrator based on the estimate provided under paragraph (3)(A),'' EPA ''shall reduce the applicable volume of cellulosic biofuel required under paragraph (2)(B) to the projected volume available during that calendar year'' and that this reduction shall be made ''not later than November 30 of the preceding calendar year.'' For those years in which EPA ''makes such a reduction,'' the statute further provides that EPA may also ''reduce the applicable volume of renewable fuel and advanced biofuels requirement . . . by the same or a lesser volume.'' As such, even when EPA exercises its cellulosic waiver authority, the determination of whether to correspondingly reduce the total renewable fuel or advanced biofuel requirements is discretionary. As recognized by EPA in the Set 1 Rule, there may be situations in which the CAA section 211(o)(7)(D) cellulosic waiver authority is available to waive cellulosic biofuel volume requirements after 2022.[8]

When EPA determines that the projected volume of cellulosic biofuel production for a given year will be less than the annual applicable volume established under CAA section 211(o)(2)(B), EPA is then required to reduce the applicable volume of cellulosic biofuel for that calendar year. Pursuant to this provision, EPA set the cellulosic biofuel volume requirement lower than the CAA section 211(o)(2)(B)(i)(III) statutory volumes enumerated by Congress for each year from 2010–2022. EPA was challenged regarding its interpretation of this statutory provision, leading the D.C. Circuit to evaluate various aspects of EPA's implementation of its cellulosic waiver authority.[9] In 2013 in *API,* the court held that EPA must take a ''neutral aim at accuracy'' in determining the projected volume of cellulosic biofuel available.[10] In *API* and *Alon Refining Krotz Springs, Inc.* v. *EPA,* the D.C. Circuit upheld EPA's decision to use the Energy Information Administration's (EIA's) projected volume of cellulosic biofuel production to inform EPA's projection, without requiring ''slavish adherence by EPA to the EIA estimate,'' and had Congress so intended ''it could have skipped the EPA 'determination' altogether.'' [11] In *Sinclair Wyoming Refining Co. LLC, et al.* v. *EPA,* the D.C. Circuit upheld EPA's reading of the statutory phrase ''projected volume available'' to exclude carryover RINs.[12]

In the proposal, EPA sought comment on whether the cellulosic waiver authority is available to reduce the cellulosic biofuel volume in 2024. EPA received comments suggesting that the cellulosic waiver authority remains available to EPA and that waiving the cellulosic biofuel volume requirement under this waiver authority would be appropriate. EPA also received comments suggesting that the cellulosic waiver authority should not or could not be used in these circumstances or that the cellulosic waiver authority is not available at all after 2022. We address some of these comments in this preamble and address others more fully in the RTC document.

Several commenters suggested that cellulosic waiver authority is not available to EPA to reduce volumes after 2022. These commenters pointed to CAA section 211(o)(7)(D), which directs EPA to determine if there is a projected cellulosic biofuel production shortfall based on an estimate provided by the U.S. Energy Information Administration (EIA) pursuant to CAA section 211(o)(3)(A). That provision, however, was in effect only through 2021.[13] As noted above, EPA has in the past utilized the EIA estimate in conjunction with other data to arrive at an estimated projection of cellulosic biofuel production. The EIA estimate has never included CNG/LNG in its projection of cellulosic biofuel production, even though over 95 percent of the cellulosic biofuel volume requirement has been met with CNG/LNG. The D.C. Circuit has upheld EPA's use of other information to inform our production estimate, particularly for CNG/LNG production that accounts for the vast majority of cellulosic biofuel.[14]

In contrast, other statutory references indicate the continuing availability of the cellulosic waiver authority to reduce the volumes EPA sets under CAA section 211(o)(2)(B). First, CAA section 211(o)(7)(D) indicates that EPA is to reduce the cellulosic biofuel volume ''for any year for which the projected volume of cellulosic biofuel is less than the applicable volume.'' The ''any year'' language is expansive and is not limited by any other language in the provision, indicating that Congress intended for it to be available for all years of the RFS program. Second, CAA section 211(o)(2)(B)(iv) indicates that EPA shall determine cellulosic volumes ''under the assumption that the Administrator will not need to issue a waiver for such years under paragraph (7)(D).'' While this language primarily provides guidance to EPA on how to determine volumes under CAA section 211(o)(2)(B)(ii), it also contemplates the continued existence of the CAA 211(o)(7)(D) cellulosic waiver authority in the set years. This is also consistent with the reference in CAA section 211(o)(7)(D) directing EPA to compare the projected production of cellulosic biofuel to the cellulosic biofuel volume ''required under paragraph (2)(B).'' This reference to paragraph (2)(B) encompasses all years of the RFS

[7] 88 FR 44479 (July 12, 2023) (''While we are establishing applicable volume requirements in this action for future years that are achievable and appropriate based on our consideration of the statutory factors, we retain our legal authority to waive volumes in the future under the waiver authorities should circumstances so warrant.'').

[8] Section 2.2, ''Renewable Fuel Standard (RFS) Program: Standards for 2023–25 and Other Changes, Response to Comments,'' EPA–420–R–23–014, June 2023 (''Set 1 Rule RTC'').

[9] See, *e.g., American Petroleum Institute* v. *EPA,* 706 F.3d 474, 479 (D.C. Cir. 2013) (''*API*'') (interpreting the ''projected volume available'' and indicating that ''the most natural reading of the provision is to call for a projection that aims at accuracy, not at deliberately indulging a greater risk of overshooting than undershooting'' in projecting the available cellulosic biofuel volume); *Americans for Clean Energy* v. *EPA,* 864 F.3d 691, 730 (D.C. Cir. 2017) (''*ACE*'') (determining EPA's use of the cellulosic waiver authority to reduce advanced and total renewable fuel was reasonable); *Sinclair Wyoming Refining Co. LLC, et al.* v. *EPA,* 101 F.4th 871, 883 (2024) (''*Sinclair*'') (rejecting biofuels producers' challenge that EPA must include carryover cellulosic RINs in its determination of ''projected volume available during that calendar year'').

[10] *API,* 706 F.3d at 476.

[11] *API,* 607 F.3d at 478. See also *Alon Refining Krotz Springs, Inc.* v. *EPA,* 396 F.3d 628, 660 (D.C. Cir. 2019).

[12] *Sinclair,* 101 F.4th at 883–86.

[13] CAA section 211(o)(3)(A) provides: ''Not later than October 31 of each of calendar years 2005 through 2021, the Administrator of the Energy Information Administration shall provide to the Administrator of the Environmental Protection Agency an estimate, with respect to the following calendar year, of the volumes of transportation fuel, biomass-based diesel, and cellulosic biofuel projected to be sold or introduced into commerce in the United States.''

[14] See, *e.g., ACE,* 864 F.3d at 728–30 (upholding EPA's cellulosic biofuel projection methodology including, among other things. EPA's reliance on biofuel producers' self-reported production startup dates, use of production ranges, and a percentile approach).

program: the compliance years up to 2022 during which EPA applied the CAA section 211(o)(2)(B)(i) statutory tables enumerating applicable volumes, and the years from 2023 forward during which EPA uses its CAA section 211(o)(2)(B)(ii) set authority to determine or set volumes applying statutory factors. We conclude that the best reading of the statute is that, when read together, the various statutory references in CAA section 211(o) indicate that Congress intended the cellulosic waiver authority to remain available to EPA for years beyond the statutory tables (*i.e.,* 2023 and beyond). For all these reasons, EPA believes this interpretation of CAA section 211(o)(7)(D)—that the cellulosic waiver authority is available to use in years after 2022—is the best reading of the statute given the text, structure of the RFS program, and the context of how EPA implements the RFS program year to year.[15] Moreover, such an interpretation is consistent with EPA's history of implementing the cellulosic waiver authority in years where cellulosic biofuel production falls short of the minimum required volume; this is simply the first instance EPA is implementing a partial cellulosic waiver in the years where EPA establishes volumes utilizing its set authority.[16]

EPA is implementing the cellulosic waiver authority to reduce the 2024 cellulosic biofuel volume after the deadline articulated in the statute; CAA section 211(o)(7)(D)(i) directs EPA to act ''by November 30 of the preceding calendar year'' to determine whether cellulosic biofuel production is likely to fall short of the volume requirements in a given year, and then reduce the standard to the projected volume available. Several commenters suggested that such untimely use is improper. We disagree. Notably, EPA has implemented the cellulosic waiver authority to reduce the cellulosic biofuel volume after the November 30 deadline on several occasions.[17] No party has specifically challenged EPA's use of the cellulosic waiver authority after the November 30 deadline, but petitioners have unsuccessfully challenged EPA's late issuance of standards under other RFS provisions. The D.C. Circuit has concluded that EPA retains the ability to issue late standards even when it acts after the statutory deadlines have passed.[18] We therefore rely on our past practice in implementing the RFS program and favorable case law to implement the cellulosic waiver authority to waive the volume requirements for a given year even when the November 30 deadline in the preceding year has passed, as it has in this instance.

CAA section 211(o)(7)(D)(i) also refers to the ''projected volume of cellulosic biofuel production'' and the ''projected volume available,'' which some commenters suggested is another indication that the provision should or could only be used prospectively. EPA believes the best reading of the statute is instead that there are projections necessary to determine the ''volume of . . . production'' and the ''volume available,'' both when EPA acts in a timely manner by November 30 of the preceding year and when EPA waives the volume requirement after the November 30 date. The use of the term ''projected'' in the statute does contemplate the need for forward-looking estimates; however, it does not follow that the statutory language prohibits EPA from acting after November 30.[19]

We note that the statutory language indicates that the use of the cellulosic waiver authority is mandatory. That is, whenever the projected volume of cellulosic biofuel production is less than the minimum applicable volume established under CAA section (o)(2)(B), EPA ''shall reduce the applicable volume of cellulosic biofuel required under paragraph (2)(B) to the projected volume available during that calendar year.'' [20] EPA implemented this provision for every year from 2010–2022 to reduce the cellulosic biofuel volume consistent with the statutory directive that EPA shall reduce the volume when the requisite conditions are met.[21]

CAA section 211(o)(7)(D)(ii) directs EPA to make CWCs available whenever it reduces the cellulosic biofuel volume under CAA section 211(o)(7)(D). CWCs—which are offered for sale to obligated parties at a price established by regulation per the statute [22]—provide compliance flexibility for obligated parties. However, it should be noted that CWCs only satisfy an obligated party's cellulosic biofuel obligation; unlike a cellulosic RIN, a CWC cannot be used to satisfy an obligated party's advanced biofuel or total renewable fuel obligation.[23] To obtain the same compliance value as a cellulosic RIN, an obligated party using a CWC for compliance with the cellulosic biofuel standard needs to also acquire an advanced or BBD RIN to use towards meeting its advanced biofuel and total renewable fuel obligations. When CWCs are made available, they generally limit or cap the price of cellulosic RINs.[24]

CAA section 211(o)(7)(D) provides that EPA may reduce the applicable volume of total renewable fuel and advanced biofuel in years when EPA reduces the applicable volume of cellulosic biofuel under that provision. That reduction must be less than or equal to the reduction in cellulosic biofuel. The D.C. Circuit explained:

> There is no requirement to reduce these latter quotas, nor does the statute prescribe any factors that EPA must consider in making its decision. . . . In the absence of any express or implied statutory directive to consider particular factors, EPA reasonably concluded that it enjoys broad discretion regarding whether and in what circumstances to reduce the advanced biofuel and total renewable fuel volumes under the cellulosic waiver provision.[25]

Using this discretion, EPA has, in the past, declined to reduce the advanced biofuel and total renewable fuel volumes in certain circumstances.[26] In other circumstances, EPA has reduced the advanced biofuel and total renewable fuel volumes using this authority.[27] It is worth noting that EPA's practice of reducing the advanced biofuel and total renewable fuel volumes utilizing the cellulosic waiver authority in past years served to carry through the partial waiver necessitated by the shortfall in cellulosic biofuel to

[15] See *Loper Bright Enterprises* v. *Raimondo,* 603 U.S. 369, 400 (2024) (''*Loper Bright*'') (in overruling *Chevron* deference, the Court observed that it ''makes no sense to speak of a 'permissible' interpretation [of a statute] that is not the one the court, after applying all relevant interpretive tools, concludes is best. In the business of statutory interpretation, if it is not the best, it is not permissible.'').

[16] As discussed further in the RTC document, EPA received a petition from the American Fuel and Petrochemical Manufacturers for a waiver of the 2023 cellulosic biofuel volume requirement. In adjudicating that petition, EPA did not address the cellulosic waiver authority and instead focused on a potential waiver under the general waiver authority.

[17] See, *e.g.,* 79 FR 25025 (May 2, 2014) (direct final rule reducing the 2013 cellulosic biofuel volume in May 2014), 80 FR 77420 (December 14, 2015) (final rule reducing the 2014 and 2015 cellulosic biofuel volumes in December 2015), 87 FR 39600 (July 1, 2022) (final rule reducing the 2020 and 2021 volumes in July 2022).

[18] See *ACE,* 864 F.3d at 721. See further discussion on this topic in RTC Section 2.3.2.

[19] See *Loper Bright* at 400.

[20] CAA section 211(o)(7)(D)(i).

[21] EPA acknowledges that it did not waive the 2023 cellulosic biofuel volume requirement. See *https://www.epa.gov/renewable-fuel-standard-program/epa-denial-petition-partial-waiver-2023-cellulosic-biofuel.*

[22] CAA section 211(o)(7)(D)(iii); 40 CFR 80.1456.

[23] 72 FR 14726–27 (March 26, 2010).

[24] See, *e.g.,* 85 FR 7025 (February 6, 2020); 87 FR 39616 (July 1, 2022).

[25] *Monroe* v. *EPA,* 750 F.3d 909, 915 (2014). See, also, *ACE* at 721.

[26] See, *e.g.,* 78 FR 49794, 49811 (August 15, 2013).

[27] See, *e.g.,* 80 FR 77420 (December 14, 2015). 81 FR 89746 (December 12, 2016).

the other nested renewable fuel categories when reducing the statutory cellulosic biofuel volumes established by Congress in 2007. In many cases reductions to the advanced biofuel and total renewable fuel volumes were necessary to enable compliance by obligated parties. For example, EPA reduced the cellulosic biofuel volume by over 15 billion gallons for 2022. Had EPA not also reduced the 2022 advanced biofuel and total renewable fuel volumes, these requirements would have been 15 billion gallons higher, far exceeding the market's ability to supply qualifying renewable fuels, even after considering available carryover RINs. In contrast, for 2024, a year for which EPA set the volume requirements using our set authority, the partial waiver of the cellulosic biofuel volume requirement is significantly smaller than in prior years (0.08 billion gallons), in part due to the fact that instead of starting with a statutory table volume set by Congress many years ago, EPA itself established the volume requirements in 2023 under the set authority. As discussed further in Section III.A, we are not adjusting the 2024 total renewable fuel and advanced biofuel volumes because those volumes have been achieved in the market.

## III. Partial Waiver of the 2024 Cellulosic Biofuel Volume Requirement

### *A. Implementation of the Cellulosic Waiver Authority*

The cellulosic waiver authority is specific regarding when it is available and how the volume reduction should be determined when acting under the authority, as discussed in Section II. EPA has determined that ''the projected volume of cellulosic biofuel production is less than the minimum applicable volume'' for 2024 and thus use of the cellulosic waiver authority is mandatory to reduce the 2024 cellulosic biofuel volume. In the Set 1 Rule, EPA established the ''minimum applicable volume'' of cellulosic biofuel for 2024 to be 1.09 billion RINs and used that volume to calculate the 2024 cellulosic biofuel percentage standard of 0.63 percent.[28] The actual number of cellulosic RINs that obligated parties will ultimately need to retire for compliance with the current standard will not be known until after the 2024 compliance deadline,[29] when obligated parties report to EPA their 2024 gasoline and diesel production and import volumes.[30] However, for the purpose of making a decision to partially waive the 2024 cellulosic biofuel volume requirement, we have assumed that the actual total 2024 cellulosic biofuel obligation, if not reduced, would be 1.09 billion RINs.[31] Based on RIN generation data for 2024, we project that only 1.01 billion cellulosic RINs were generated in 2024, representing the projected volume of cellulosic biofuel available in 2024.[32] This is 0.08 billion fewer RINs than the 1.09 billion RINs needed to comply with the original 2024 cellulosic biofuel standard, a shortfall of approximately seven percent. We therefore find that the circumstances have triggered the need for implementation of the cellulosic waiver authority for 2024.

When EPA determines that a waiver of the cellulosic biofuel volume requirement is appropriate under CAA section 211(o)(7)(D)(i), EPA must then reduce the required cellulosic biofuel volume to ''the projected volume available.'' We have previously interpreted the phrase ''projected volume available'' to exclude carryover RINs when determining the volume adjustment to be made; this interpretation was affirmed by the D.C. Circuit in *Sinclair.*[33] EPA has consistently interpreted the ''projected volume available'' as ''the volume of qualifying cellulosic biofuel projected to be produced or imported and available for use as transportation fuel in the U.S. in that year.''[34] In determining the ''projected volume available,'' EPA must take a ''neutral aim at accuracy.''[35]

As discussed above, the projected volume of cellulosic biofuel available in 2024 was 1.01 billion RINs. Thus, when the cellulosic waiver authority is applied, EPA is only able to reduce the 2024 cellulosic biofuel volume to the projected volume available of 1.01 billion RINs. However, in accordance with the statute, EPA is also required to make CWCs available to obligated parties, which can be used—along with additional BBD or advanced RINs—to cover any remaining shortfall.[36] The availability of CWCs helps ensure RFS program stability by reducing the likelihood that obligated parties may be forced into non-compliance with their RFS obligations; any obligated party that is unable to acquire sufficient cellulosic RINs to comply with their 2024 cellulosic biofuel obligations—plus any cellulosic RIN deficit carried from 2023[37]—will be able to purchase CWCs to cover the shortfall.[38]

Given that ''the projected volume of cellulosic biofuel production is less than the minimum applicable volume'' for 2024, we are implementing the cellulosic waiver authority to waive the 2024 cellulosic biofuel volume requirement to 1.01 billion RINs, a reduction of 0.08 billion RINs from the original volume requirement of 1.09 billion RINs. This volume requirement matches the actual cellulosic RIN generation for 2024 of 1.01 billion RINs.

Finally, CAA section 211(o)(7)(D) provides that EPA may reduce the applicable volume of total renewable fuel and advanced biofuel in years when EPA reduces the applicable volume of cellulosic biofuel under that provision. That reduction must be less than or equal to the reduction in cellulosic biofuel. The D.C. Circuit concluded that the cellulosic waiver authority provides EPA ''broad discretion'' to consider a variety of factors in determining whether to reduce the total renewable fuel and advanced biofuel volumes

---

[28] 88 FR 44470–71 (July 12, 2023).

[29] The compliance deadline for the 2024 standards will be the first quarterly reporting deadline after the effective date of this action revising the 2024 cellulosic biofuel standard. 40 CFR 80.1451(f)(1)(i)(B)(*5*).

[30] 40 CFR 80.1451 and 80.1427(a).

[31] Because the compliance obligation is calculated on a percentage basis, if the actual gasoline and diesel volumes reported by obligated parties differ from the projected gasoline and diesel volumes that were used to derive the percentage standard, then the actual number of RINs required for compliance will differ from the projected volume that was used to calculate the percentage standard. Although we rely on the 1.09-billion-RIN projection for 2024 in the Set 1 Rule that was the basis for the 2024 cellulosic biofuel percentage standard, EPA would reach the same conclusion to waive the 2024 cellulosic biofuel volume requirement, for the reasons stated below, using a higher RIN obligation (*i.e.,* a higher gasoline and diesel projection).

[32] See ''Total Net Generation'' RIN data table at: *https://www.epa.gov/fuels-registration-reporting-and-compliance-help/rins-generated-transactions.* This table includes all reported cellulosic RINs that were generated in 2024 and were not otherwise retired due to RIN generation error (*i.e.,* an invalid RIN). Thus, the volume of 2024 cellulosic RINs in this table is the volume of RINs that have been made available for compliance with the 2024 cellulosic biofuel standard.

[33] *Sinclair,* 101 F.4th at 883–86.

[34] See, *e.g.,* 87 FR 39600 (July 1, 2022). See also *Sinclair,* 101 F.4th at 883–86.

[35] *API* v. *EPA,* 706 F.3d 474, 479 (D.C. Cir. 2013).

[36] Pursuant to 40 CFR 80.1405(d), the CWC price is calculated using the methodology specified in 40 CFR 80.1456(d) and posted on EPA's website at: *https://www.epa.gov/renewable-fuel-standard-program/cellulosic-waiver-credits-under-renewable-fuel-standard-program.*

[37] As noted in the proposal, we are aware of RIN deficits from the 2023 compliance year that will need to be fulfilled by the 2024 compliance deadline. 89 FR 100442, 100445–46 (December 12, 2024). This topic is discussed further in the RTC document.

[38] Unlike cellulosic RINs—which apply towards an obligated party's cellulosic biofuel, advanced biofuel, and total renewable fuel obligations—CWCs only apply towards an obligated party's cellulosic biofuel obligation and not toward their nested advanced biofuel and total renewable fuel obligation. Obligated parties that satisfy their cellulosic biofuel obligations with CWCs would therefore also have to purchase additional BBD or advanced RINs to meet their associated advanced biofuel and total renewable fuel obligations.

under this provision.[39] Advanced and total RIN generation for 2024 exceeded the required volumes by over 3.8 billion RINs (10.42 billion advanced RINs generated vs. 6.54 billion RIN advanced biofuel volume requirement) and 3.7 billion RINs (25.30 billion total RINs generated vs. 21.54 billion total renewable fuel volume requirement), respectively, notwithstanding the projected shortfall in cellulosic biofuel production.[40] Thus, we believe reductions to the 2024 advanced biofuel and total renewable fuel volumes are not necessary or warranted based on the available supply data, given that the market has provided volumes of these fuels in excess of the requirements established in the Set 1 Rule. Reductions in these volume requirements at this time would only serve to increase the number of advanced and total carryover RINs. Historically, we have declined to take actions that would inflate the number of available carryover RINs.[41]

*B. Economic Impact Analysis*

This section discusses our analysis of the anticipated economic impact of the partial waiver of the 2024 cellulosic biofuel volume requirement. Consistent with the goals of Executive Orders 12866 and 14192, this analysis is intended to provide transparency regarding the costs and benefits of this economically significant deregulatory action. Because we are reducing the 2024 cellulosic biofuel volume, this action is expected to result in significant costs savings. However, quantitatively projecting the economic impact of this reduction is challenging for several reasons. First, the partial waiver is due to a shortfall in the volume of cellulosic biofuel in 2024. Because of this, higher volumes of cellulosic RINs cannot simply be made available at greater prices; instead, obligated parties will be unable to purchase additional quantities of 2024 cellulosic RINs at any price. The potential economic impact of this action is further complicated by the fact that while some obligated parties can defer some or all of their 2024 cellulosic biofuel obligation to 2025, other obligated parties that already carried cellulosic RIN deficits from 2023 into 2024 are required to fully satisfy their cellulosic biofuel obligations in 2024, including the cellulosic RIN deficits carried forward from 2023. Any party that fails to do so would likely be in non-compliance and could be subject to penalties.[42]

Despite the complications associated with estimating the economic impacts of this action, we can determine that it will result in cost savings. Because we are unable to estimate the cost of production of cellulosic biofuel that was not produced, we are estimating the cost savings of this action using RIN prices to approximate the cost of the marginal gallon of cellulosic biofuel relative to the petroleum fuel the marginal gallon displaces.[43] We are reducing only the 2024 cellulosic biofuel volume. Because we are not reducing the 2024 advanced biofuel and total renewable fuel volumes, this action effectively replaces the reduced cellulosic biofuel volume with additional volumes of advanced biofuel, which generally has a lower marginal cost than cellulosic biofuel.[44] In 2024, the average price for a cellulosic (D3/D7) RIN was $3.11 and the average price for a D4/D5 RIN was $0.78.[45] The price difference between a D3/D7 RIN and a D4/D5 RIN was $2.34. Multiplying this price difference by the magnitude of the reduction in the cellulosic biofuel volume requirement (80 million RINs), we estimate a cost savings of $187 million from this action.

Finally, we can reasonably project that because this action will reduce demand for cellulosic RINs, it is expected to directionally decrease cellulosic RIN prices. The exact magnitude of this price reduction depends on a wide range of market factors that prevent us from quantitively projecting a RIN price impact. At the same time, because this action incrementally increases demand for advanced RINs, it is projected to directionally increase BBD and advanced RIN prices. We note, however, that this price impact is expected to be relatively small, as this action will increase demand for advanced biofuel by the magnitude of the partial waiver of the 2024 cellulosic biofuel volume requirement (0.08 billion RINs). This is less than one percent of the supply of advanced biofuel for 2024 (10.41 billion RINs).

*C. Calculation of 2024 Cellulosic Biofuel Percentage Standard*

The obligated parties to which the percentage standards apply are producers and importers of gasoline and diesel, as defined by 40 CFR 80.2. Each obligated party multiplies the percentage standards by the sum of all non-renewable gasoline and diesel they produce or import to determine their Renewable Volume Obligations (RVOs).[46] The RVOs are the number of RINs that the obligated party is responsible for procuring and retiring to demonstrate compliance with the applicable standards for that year. As described in Section III.A, we are implementing the cellulosic waiver authority to partially waive the 2024 cellulosic biofuel volume requirement from 1.09 billion RINs to 1.01 billion RINs.

---

[39] *ACE* at 730–734. See also *Monroe Energy, LLC* v. *EPA,* 750 F.3d 909 (D.C. Cir. 2014).

[40] See ''Total Net Generation'' RIN data table at: *https://www.epa.gov/fuels-registration-reporting-and-compliance-help/rins-generated-transactions.* This table includes all reported RINs that were generated in 2024 and were not otherwise retired due to RIN generation error (*i.e.,* an invalid RIN). Thus, the volume of 2024 RINs in this table is the volume of RINs that have been made available for compliance with the 2024 RFS standards.

[41] 87 FR 39600, 39621 (July 1, 2022) (''While EPA has previously set the RFS standards at what the market actually used (like for 2014 and 2015 in the 2014–2016 rule), we have never intentionally reduced the standards with the express intent to inflate the size of the carryover RIN bank.''); ''Renewable Fuel Standard (RFS) Program: RFS Annual Rules—Response to Comments,'' EPA–420–R–22–009, June 2022, Section 2.6.1.

[42] We recognize that the cellulosic waiver authority is mandatory, and thus avoids the potential noncompliance and lack of RINs described herein. Nevertheless, we describe these potential outcomes to illustrate the difficulty in calculating the cost savings of the action.

[43] We are using these RIN prices to approximate the societal cost for these fuels. Our analyses indicate that, on average across the U.S., RIN costs are recovered by obligated parties and passed through to consumers. For a further discussion of the ability of obligated parties to recover the cost of RINs see ''Denial of Petitions for Rulemaking to Change the RFS Point of Obligation,'' EPA–420–R–17–008, November 2017.

[44] The nested nature of the RFS program allows cellulosic biofuel to be used to meet the advanced biofuel and total renewable fuel volume requirements. Any cellulosic biofuel that can be supplied beyond the required volume can be used in place of advanced biofuel.

[45] Prices based on EMTS data. RIN prices are the average of all trades of vintage 2023 and 2024 separated RINs in calendar year 2024.

[46] 40 CFR 80.1407.

The formula used to calculate the cellulosic biofuel percentage standard applicable to obligated parties as a function of their gasoline and diesel fuel production or importation is provided in 40 CFR 80.1405(c). Using the same values from the Set 1 Rule for the variables in this formula other than $RFV_{CB}$ (the cellulosic biofuel volume),[47] we have calculated the revised cellulosic biofuel percentage standard for 2024 to be 0.59 percent, down from 0.63 percent.[48] This percentage standard is included in the regulations at 40 CFR 80.1405(a) and applies to producers and importers of gasoline and diesel.

## IV. Change to Calculation of Cellulosic Waiver Credit Price

As discussed in Section II.B, for any year for which EPA uses the cellulosic waiver authority to reduce the required volume of cellulosic biofuel, EPA must provide obligated parties the opportunity to purchase CWCs. The price of these credits is determined using a formula specified in CAA section 211(o)(7)(D)(ii), which is ''at the higher of $0.25 per gallon or the amount by which $3.00 per gallon exceeds the average wholesale price of a gallon of gasoline in the United States,'' adjusted for inflation. The RFS regulations previously specified that the ''U.S. Total Gasoline Bulk Sales (Price) by Refiners as provided by the Energy Information Administration'' is to be used to determine the average wholesale price of gasoline and the inflation adjustment.[49] However, this data source is no longer being issued by EIA and has not been updated since March 2022.

We are therefore revising our regulations to point to a new data source for the average wholesale price of gasoline to be used in the calculation of the CWC price. The only wholesale gasoline prices currently reported by EIA are spot prices for New York Harbor (conventional gasoline), U.S. Gulf Coast (conventional gasoline), and Los Angeles (RBOB regular gasoline).[50] We proposed to revise the regulations to calculate the average wholesale gasoline price using a weighted average of EIA's reported spot prices for wholesale gasoline using the weighting factors specified in Table IV–1. Commenters were generally supportive of the proposed changes and therefore we are finalizing these new data sources and weighting factors as proposed.

TABLE IV–1—WEIGHTING FACTORS FOR CALCULATING THE AVERAGE WHOLESALE GASOLINE PRICE

| EIA spot price | Weighting factor [a] (%) |
|---|---|
| New York Harbor (conventional gasoline) | 37.5 |
| U.S. Gulf Coast (conventional gasoline) | 37.5 |
| Los Angeles (RBOB regular gasoline) | 25.0 |

[a] Weighting factors based on approximate amounts of conventional gasoline (CG) and reformulated gasoline (RFG) sold in the United States, with an equal weighting factor for the New York Harbor and U.S. Gulf Coast CG prices. EPA currently estimates that approximately 25 percent of gasoline sold in the United States is RFG (*https://www.epa.gov/gasoline-standards/reformulated-gasoline*).

Consistent with the approach used for the previous EIA data source, we are specifying that the CWC price is calculated using average monthly gasoline spot price data from the 12-month period ending June of the year prior to the relevant year (*e.g.,* July 2022 to June 2023 for the 2024 CWC price). Since we are using the cellulosic waiver authority to partially waive the 2024 cellulosic biofuel volume requirement in this action, CWCs will be made available to obligated parties to purchase for the 2024 compliance year. Using the new data sources and weighting factors in Table IV–1 results in a 2024 CWC price of $1.61.[51]

## V. Measurement of Renewable CNG/LNG Using Documentation

We are also amending 40 CFR 80.155(a) to clarify that renewable natural gas (RNG) RIN separators may obtain the measurement of renewable CNG/LNG through documentation. Under 40 CFR 80.155(a), measurements of renewable CNG/LNG must be made using specified in-line GC meters and flow meters, or with an EPA-accepted alternative measurement protocol. We proposed and are now finalizing an additional option to allow RNG RIN separators to use documentation that establishes the volumes of natural gas or renewable CNG/LNG dispensed to satisfy the continuous measurement requirement. Because these statements are typically based on readings from meters that generally comport with the already specified meter standards, EPA has concluded this is an appropriate approach for RNG RIN separators to determine the amount of renewable CNG/LNG used as transportation fuel.

Commenters were generally supportive of this proposed change. In the proposal, we provided the example of a pipeline or utility statement as acceptable documentation for purposes of establishing the volume of natural gas or renewable CNG/LNG. Several commenters suggested that EPA add language to clarify that weigh tickets and bills of lading are also acceptable documentation for renewable LNG, as well as specify default conversion factors for documentation that is not provided in Btu. We agree with the commenters and have added weigh tickets and bills of lading as further examples to the final regulations, as well as default conversion factors in 40 CFR 80.155(f).

EPA continues to evaluate the other proposed updates and clarifications to the RFS biogas regulations, including other proposed revisions to 40 CFR 80.155(a), and may finalize them in a later action.

## VI. Severability

We intend for the regulations promulgated in this action to implement the cellulosic waiver credit price calculation and measurement of renewable CNG/LNG to be severable from our action to implement the cellulosic waiver authority to reduce the 2024 cellulosic biofuel volume. These actions are distinct and independent, with separate justifications. Therefore, if a court were to invalidate the use of the cellulosic waiver authority, we would intend for the regulatory changes to remain in place.

## VII. Judicial Review

Section 307(b)(1) of the CAA governs judicial review of final actions by the EPA. This section provides, in part, that

[47] 88 FR 44519–21 (July 12, 2023).

[48] See ''Calculation of 2024 Cellulosic Biofuel Percentage Standard,'' available in the docket for this action.

[49] 40 CFR 80.1456(d)(2).

[50] This data is publicly available at: EIA, ''Spot Prices,'' Petroleum & Other Liquids. *https://www.eia.gov/dnav/pet/pet_pri_spt_s1_m.htm.*

[51] EPA, ''2024 Cellulosic Waiver Credit Price Calculation,'' EPA 420–B–25–017, June 2025.

petitions for review must be filed in the United States Court of Appeals for the District of Columbia Circuit: (i) when the agency action consists of specifically enumerated actions or ''any other nationally applicable regulations promulgated, or final action taken, by the Administrator,'' or (ii) when such action is locally or regionally applicable, but ''such action is based on a determination of nationwide scope or effect and if in taking such action the Administrator finds and publishes that such action is based on such a determination.'' For locally or regionally applicable final actions that are based on a determination of nationwide scope or effect, the CAA reserves to the EPA complete discretion to decide whether to invoke the exception in (ii).[52]

This final action modifies requirements under section 211(*o*) of the Clean Air Act, 42 U.S.C. 7545(*o*). Because this final action promulgates a revised standard and regulatory amendments under the CAA, it is ''nationally applicable'' under CAA section 307(b)(1) either as one of the specifically enumerated actions (''any control or prohibition under section 7545 of this title'') or as a ''nationally applicable regulation[ ] promulgated . . . by the Administrator.'' Under section 307(b)(1) of the CAA, petitions for judicial review of this action must be filed in the United States Court of Appeals for the District of Columbia Circuit by September 5, 2025. Filing a petition for reconsideration by the Administrator of this final action under CAA section 307(d)(7)(B) does not affect the finality of the action for purposes of judicial review, nor does it extend the time within which a petition for judicial review must be filed, and shall not postpone the effectiveness of the action.

## VIII. Statutory and Executive Order Reviews

Additional information about these statutes and Executive orders can be found at *https://www.epa.gov/laws-regulations/laws-and-executive-orders.*

### *A. Executive Order 12866: Regulatory Planning and Review*

This is an economically significant regulatory action because it meets the criteria in section 3(f)(1) of Executive Order 12866. Accordingly, EPA submitted this action to the Office of Management and Budget (OMB) for Executive Order 12866 review. Documentation of any changes made in response to the Executive Order 12866 review is available in the docket. EPA prepared an analysis of the potential economic impacts associated with this action, available in Section III.B.

### *B. Executive Order 14192: Unleashing Prosperity Through Deregulation*

This action is considered an Executive Order 14192 deregulatory action. Details on the estimated cost savings of this final rule can be found in EPA's analysis of the economic impact associated with this action in Section III.B.

### *C. Paperwork Reduction Act (PRA)*

This action does not impose an information collection burden under the PRA. OMB has previously approved the information collection activities related to this final rule and has assigned the following OMB control numbers 2060–0725, 2060–0740, and 2060–0749. This action reduces the required cellulosic biofuel volume for 2024 and does not impose new or different reporting requirements on regulated parties than already exist for the RFS program.

### *D. Regulatory Flexibility Act (RFA)*

I certify that this action will not have a significant economic impact on a substantial number of small entities under the RFA. In making this determination, EPA concludes that the impact of concern for this rule is any significant adverse economic impact on small entities and that the agency is certifying that this rule will not have a significant economic impact on a substantial number of small entities because the rule relieves regulatory burden on the small entities subject to the rule.

The small entities directly regulated by the RFS program are small refiners, which are defined at 13 CFR 121.201. EPA believes that there are currently 6 refiners (owning 7 refineries) producing gasoline and/or diesel that meet the definition of small entity by having 1,500 employees or fewer. This action decreases burden via a reduction in the 2024 cellulosic biofuel standard, which applies proportionally to all obligated parties, including small refiners. We have therefore concluded that this action will relieve regulatory burden for all directly regulated small entities.

### *E. Unfunded Mandates Reform Act (UMRA)*

This action does not contain an unfunded mandate of $100 million (adjusted annually for inflation) or more (in 1995 dollars) as described in UMRA, 2 U.S.C. 1531–1538, and does not significantly or uniquely affect small governments. The action implements a mandate specifically and explicitly set forth in CAA section 211(o)(7)(D) without the exercise of any policy discretion by EPA.

### *F. Executive Order 13132: Federalism*

This action does not have federalism implications. It will not have substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government.

### *G. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments*

This action does not have Tribal implications as specified in Executive Order 13175. This action will be implemented at the Federal level and affects transportation fuel refiners, blenders, marketers, distributors, importers, exporters, and renewable fuel producers and importers. Tribal governments would be affected only to the extent they produce, purchase, and use regulated fuels. Thus, Executive Order 13175 does not apply to this action.

### *H. Executive Order 13045: Protection of Children From Environmental Health Risks and Safety Risks*

EPA interprets Executive Order 13045 as applying only to those regulatory actions that concern environmental health or safety risks that EPA has reason to believe may disproportionately affect children, per the definition of ''covered regulatory action'' in section 2–202 of the Executive order. Therefore, this action is not subject to Executive Order 13045 because it reduces the 2024 cellulosic biofuel volume and does not concern an environmental health risk or safety risk. Since this action does not concern human health, EPA's Policy on Children's Health also does not apply.

### *I. Executive Order 13211: Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use*

This action is not a ''significant energy action'' because it is not likely to have a significant adverse effect on the supply, distribution, or use of energy. This action reduces the required cellulosic biofuel volume for 2024 consistent with the volume of such fuel actually made available in 2024. Therefore, it is not expected to have any impact on the supply, distribution, or use of energy. In general, the RFS

[52] *Sierra Club* v. *EPA,* 47 F.4th 738, 745 (D.C. Cir. 2022) (''EPA's decision whether to make and publish a finding of nationwide scope or effect is committed to the agency's discretion and thus is unreviewable''); *Texas* v. *EPA,* 983 F.3d 826, 83435 (5th Cir. 2020).

program is designed to achieve positive effects on the Nation's transportation fuel supply by increasing energy independence and security.

*J. National Technology Transfer and Advancement Act (NTTAA) and 1 CFR Part 51*

This action does not involve technical standards.

ASTM D3588 is referenced in the amendatory text of this document and has already been approved for § 80.155. There are no changes to the IBR material.

*K. Congressional Review Act (CRA)*

This action is subject to the CRA, and the EPA will submit a rule report to each House of the Congress and to the Comptroller General of the United States. This action is not a ''major rule'' as defined by 5 U.S.C. 804(2).

**IX. Statutory Authority**

Statutory authority for this action comes from sections 114, 203–05, 208, 211, and 301 of the Clean Air Act, 42 U.S.C. 7414, 7522–24, 7542, 7545, and 7601.

**List of Subjects in 40 CFR Part 80**

Environmental protection, Administrative practice and procedure, Air pollution control, Diesel fuel, Fuel additives, Gasoline, Imports, Incorporation by reference, Oil imports, Petroleum, Renewable fuel.

**Lee Zeldin,**

*Administrator.*

For the reasons set forth in the preamble, EPA amends 40 CFR part 80 as follows:

## PART 80—REGULATION OF FUELS AND FUEL ADDITIVES

■ 1. The authority citation for part 80 continues to read as follows:

**Authority:** 42 U.S.C. 7414, 7521, 7542, 7545, and 7601(a).

### Subpart E—Biogas-Derived Renewable Fuel

■ 2. Amend § 80.155 by:

■ a. Revising paragraph (a) introductory text;

■ b. Adding paragraphs (a)(4) and (5); and

■ c. Revising paragraph (f).

The revisions and addition read as follows:

**§ 80.155 Sampling, testing, and measurement.**

(a) *Biogas and RNG continuous measurement.* Except as specified in paragraph (a)(5) of this section, any party required to measure the volume of biogas, RNG, or renewable CNG/LNG under this subpart must continuously measure using meters that comply with the requirements in paragraphs (a)(1) and (2) of this section, or have an accepted alternative measurement protocol as specified in paragraph (a)(3) of this section:

* * * * *

(4) [Reserved]

(5) An RNG RIN separator must measure natural gas or renewable CNG/LNG using one of the following:

(i) A method specified in paragraphs (a)(1) through (3) of this section.

(ii) Documentation (*e.g.,* pipeline or utility statements, scale tickets, or bills of lading) that establishes the volume of natural gas or renewable CNG/LNG. Documentation must be specified in Btu LHV or converted as specified in paragraph (f) of this section.

* * * * *

(f) *Unit conversions.* (1) A party converting between Btu HHV and Btu LHV for biogas, treated biogas, natural gas, or CNG/LNG must use the ratio of HHV and LHV of methane as specified in ASTM D3588 (incorporated by reference, see § 80.12).

(2) A party with documentation under paragraph (a)(5) of this section that is not specified in Btu must convert to Btu LHV as follows:

(i) A party converting between scf and Btu LHV for CNG must use 934 Btu LHV/scf.

(ii) A party converting between pounds and Btu LHV for LNG must use 21,240 Btu LHV/lb.

* * * * *

### Subpart M—Renewable Fuel Standard

■ 3. Amend § 80.1405 by revising entry ''2024'' in table 1 to paragraph (a) to read as follows:

**§ 80.1405 What are the Renewable Fuel Standards?**

(a) * * *

TABLE 1 TO PARAGRAPH (a)—ANNUAL RENEWABLE FUEL STANDARDS

| Year | Cellulosic biofuel standard (%) | Biomass-based diesel standard (%) | Advanced biofuel standard (%) | Renewable fuel standard (%) | Supplemental total renewable fuel standard (%) |
|---|---|---|---|---|---|
| * * * | * | * | | * | * |
| 2024 | 0.59 | 2.82 | 3.79 | 12.50 | n/a |
| * * * | * | * | | * | * |

* * * * *

■ 4. Amend § 80.1456 by revising paragraph (d)(2) to read as follows:

**§ 80.1456 What are the provisions for cellulosic biofuel waiver credits?**

* * * * *

(d) * * *

(2) The wholesale price of gasoline is calculated by applying the weighting factors specified in table 1 to this paragraph (d)(2) to the average monthly gasoline spot price values specified in table 1 for the twelve-month period ending June of the year preceding the compliance period.

TABLE 1 TO PARAGRAPH (d)(2)—WHOLESALE PRICE OF GASOLINE WEIGHTING FACTORS

| Gasoline spot price data source [1] | Weighting factor (%) |
|---|---|
| Conventional Gasoline—New York Harbor, Regular | 37.5 |
| Conventional Gasoline—U.S. Gulf Coast, Regular | 37.5 |

TABLE 1 TO PARAGRAPH (d)(2)—WHOLESALE PRICE OF GASOLINE WEIGHTING FACTORS—Continued

| Gasoline spot price data source [1] | Weighting factor (%) |
|---|---|
| RBOB Regular Gasoline—Los Angeles | 25.0 |

[1] Reported by the Energy Information Administration.

* * * * *

[FR Doc. 2025–11153 Filed 7–3–25; 8:45 am]

BILLING CODE 6560–50–P

## FEDERAL COMMUNICATIONS COMMISSION

### 47 CFR Part 1

**[MD Docket No. 24–85; FCC 25–31; FR ID 301014]**

## Assessment and Collection of Space and Earth Station Regulatory Fees for Fiscal Year 2024

**AGENCY:** Federal Communications Commission.

**ACTION:** Final rule.

**SUMMARY:** In this document, the Federal Communications Commission (Commission or FCC) adopts targeted revisions to its existing methodology of assessing regulatory fees for space and earth stations that will be effective for fiscal year 2025.

**DATES:** Effective on September 14, 2025.

**FOR FURTHER INFORMATION CONTACT:** Stephen Duall, 202–418–1103, *Stephen.Duall@fcc.gov.*

**SUPPLEMENTARY INFORMATION:** This is a summary of the Commission's Third Report and Order in MD Docket No. 24–85, FCC 25–31, adopted June 5, 2025, and released June 9, 2025. The full text of this document is available online at *https://docs.fcc.gov/public/attachments/FCC-25-31A1.pdf.* The full text of this document is also available for inspection and copying during business hours in the FCC Reference Center, 45 L Street NE, Washington, DC 20554. To request materials in accessible formats for people with disabilities, send an email to *FCC504@fcc.gov* or call the Consumer & Governmental Affairs Bureau at 202–418–0530 (voice), 202–418–0432 (TTY).

*Final Regulatory Flexibility Analysis.* The Regulatory Flexibility Act of 1980, as amended (RFA), requires that an agency prepare a regulatory flexibility analysis for notice and comment rulemakings, unless the agency certifies that ''the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities.'' The Commission has prepared an Final Regulatory Flexibility Analysis (FRFA) concerning the potential impact of the proposed rule and policy changes contained in the Commission's Third Report and Order. The FRFA is set forth in the appendix of the FCC Document *https://docs.fcc.gov/public/attachments/FCC-25-31A1.pdf* and a summary is included below.

*Final Paperwork Reduction Act Analysis.* The Commission's Third Report and Order does not contain new or modified information collection requirements subject to the Paperwork Reduction Act of 1995 (PRA), Public Law 104–13. In addition, the Commission notes that pursuant to the Small Business Paperwork Relief Act of 2002, Public Law 107–198, *see* 44 U.S.C. 3506(c)(4), the Commission previously sought specific comment on how the Commission might further reduce the information collection burdens for small business concerns with fewer than 25 employees. In the Commission's Third Report and Order, the Commission assessed the effects of its adoption of rules implementing the Part 25 licensing and operating provisions and technical requirements. The Commission finds that such requirements are unlikely to directly impact businesses with fewer than 25 employees.

*Congressional Review Act.* The Commission has determined, and the Administrator of the Office of Information and Regulatory Affairs, Office of Management and Budget, concurs that this rule is non-major under the Congressional Review Act, 5 U.S.C. 804(2). The Commission will send a copy of the Third Report and Order to Congress and the Government Accountability Office, pursuant to 5 U.S.C. 801(a)(1)(A).

### Synopsis

### I. Introduction

1. In the Third Report and Order (Order), the Commission adopts targeted amendments to its existing methodology of assessing regulatory fees for space and earth stations pursuant to section 9 of the Communications Act of 1934 (Act), as amended. These changes will be effective for the fiscal year 2025 (FY 2025) assessment and collection of regulatory fees.

2. The Commission began this proceeding after the creation of the Space Bureau in 2023 to ensure that its regulatory fees structure for space and earth station fee payors remain fair, administrable, and sustainable in light of the substantial changes in the space industry in recent years. The Commission is mindful of the significance of ensuring its work is consistent with such overarching goals because the fee schedule adopted for fiscal year 2024 contained sizable increases in the fees assessed to space and earth station fee payors compared to the previous fiscal year.

3. In the Order, the Commission takes two key actions for the current fiscal year to address this situation. First, the Commission assesses regulatory fees on stations once they are authorized, rather than when the stations are certified to be operational, as is currently the case. Second, the Commission splits existing regulatory fee categories for Space Stations (Non-Geostationary Orbit) into two new fee categories: small constellations (fewer than 1000 authorized space stations) and large constellations (1000 authorized space stations or more). These changes will better distinguish between space station regulatees and will more accurately apportion fee burdens among them, which should result in lower per unit regulatory fees for the majority of space station fee payors compared to fiscal year 2024. The Order also adopts an approach that broadens the base of regulatory fee payors to better align fees with the benefits of regulation and that is less subjective than the current system that allocates fees based on the estimated ''complexity'' of an NGSO system.

4. The changes adopted support the Commission's goal that its regulatory fees are fair, administrable, and sustainable. The Commission views the targeted changes adopted as a step to quickly improve the assessment of regulatory fees for the current fiscal year, but the Commission also recognizes that as the industry develops, and as the Commission seeks to streamline much of the Space Bureau's operations, that additional improvements to the methodology may be proposed in future fiscal years.

### II. Background

5. Section 9 of the Act obligates the Commission to assess and collect regulatory fees each year in an amount that can reasonably be expected to equal the amount of its annual salaries and expenses (S&E) appropriation. Thus, the Commission has no discretion regarding the total amount to be collected in any given fiscal year. In accordance with the statute, each year the Commission proposes adjustments to the prior fee schedule under section 9(c) to ''(A) reflect unexpected increases or decreases in the number of units subject to the payment of such fees; and (B) result in the collection of the amount required'' by the Commission's annual