**NOT YET SCHEDULED FOR ORAL ARGUMENT**

**Nos. 25-1183, 25-1184**

In the

# United States Court of Appeals
# For the District of Columbia Circuit

—————————

COALITION FOR RENEWABLE NATURAL GAS,

*Petitioner,*

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

*Respondent.*

—————————

On Petition for Review of Final Agency Action

—————————

**INITIAL OPENING BRIEF OF PETITIONER**
**COALITION FOR RENEWABLE NATURAL GAS**

—————————

Sandra P. Franco
FRANCO ENVIRONMENTAL
LAW, LLC
600 Pennsylvania Avenue, SE
Unit 15577
Washington, DC 20003
(202) 256-6115
sandra@francoenvironmentallaw.com

Jonathan Y. Ellis
Grace Greene Simmons
MCGUIREWOODS LLP
888 16th St. NW, Suite 500
Washington, D.C. 20006
(202) 828-2887
jellis@mcguirewoods.com
gsimmons@mcguirewoods.com

*Counsel for Coalition for Renewable Natural Gas*

## CERTIFICATE AS TO PARTIES, RULINGS UNDER REVIEW, AND RELATED CASES

Under D.C. Circuit Rule 28(a)(1), the following Certificate as to Parties, Rulings, and Related Cases is made on behalf of the Coalition for Renewable Natural Gas (RNG COALITION).

### A.    Parties and *Amici*

This case is consolidated with *American Fuel & Petrochemical Manufacturers v. EPA*, No. 25-1184.  Petitioner in this case (No. 25-1183) is RNG COALITION.  Petitioner in the consolidated case (No. 25-1184) is American Fuel & Petrochemical Manufacturers (AFPM).  Respondent in both cases is U.S. Environmental Protection Agency (EPA).  AFPM is also intervenor in support of Respondent in Case No. 25-1183, and RNG COALITION is intervenor in support of Respondent in Case No. 25-1184.  As of this filing, there are no *amici* parties.

### B.    Rulings Under Review

The final agency action under review is by EPA entitled, "Renewable Fuel Standard (RFS) Program: Partial Waiver of the 2024 Cellulosic Biofuel Volume Requirement," published at 90 Fed. Reg. 29751 (July 7, 2025).

i

### C.    Related Cases

This case is related to and consolidated with *American Fuel & Petrochemical Manufacturers v. EPA*, No. 25-1184, which similarly challenges the Final Rule implementing the 2024 partial waiver.

AFPM has brought challenges to EPA's refusal to waive the 2023 cellulosic biofuel volume requirement, raising similar issues to those presented here, both in this Court, *American Fuel & Petrochemical Manufacturers v. EPA*, No. 24-1163, and in the U.S. District Court for the District of Columbia, *American Fuel & Petrochemical Manufacturers v. Zeldin*, No. 24-cv-2361. Both cases are still pending.

Undersigned counsel is not aware of any other related cases before this Court or any other court.

## RULE 26.1 DISCLOSURE

Under Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, the Coalition for Renewable Natural Gas (RNG COALITION) makes the following disclosure:

RNG COALITION has no parent companies, and no publicly held company has a 10% or greater ownership interest. It has not issued shares or debt securities to the public.

RNG COALITION is a non-profit association of companies and organizations dedicated to the advancement of renewable natural gas as a clean, green, alternative, and domestic energy and fuel resource. It advocates on behalf of its members and provides education for the public in support of the sustainable development, deployment, and utilization of renewable natural gas, including participating in regulatory proceedings and litigation involving implementation of the Renewable Fuel Standard program by EPA, as well as other regulatory actions that may impact the renewable natural gas industry. RNG COALITION's membership includes companies throughout the value chain of waste feedstock conversion to transportation fuel under the Renewable Fuel Standard program. RNG COALITION is a "trade association" as defined in Circuit Rule 26.1(b).

iii

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS UNDER REVIEW, AND RELATED CASES ..........................................................................i

RULE 26.1 DISCLOSURE ........................................................... iii

TABLE OF AUTHORITIES ..........................................................vi

GLOSSARY OF ABBREVIATIONS...............................................x

INTRODUCTION ..........................................................................1

JURISDICTIONAL STATEMENT................................................4

STATEMENT OF ISSUES ............................................................4

STATUTES AND REGULATIONS...............................................5

STATEMENT OF THE CASE .......................................................5

      A.     Renewable Fuel Standard.............................................5

      B.     The Present Waiver ...................................................10

SUMMARY OF ARGUMENT.....................................................12

STANDING ................................................................................15

STANDARD OF REVIEW ..........................................................16

ARGUMENT ..............................................................................16

I.     The Clean Air Act Does Not Permit EPA to Retroactively Exercise the Cellulosic Waiver ...............................................................16

      A.     The statute's text proves that the cellulosic waiver can only be used prospectively ...........................................18

      B.     The statute's structure confirms that the cellulosic waiver is prospective ..........................................................21

      C.     The RFS program's purpose requires that the cellulosic waiver be prospective ..........................................24

      D.     EPA's contrary justifications are not persuasive.........26

            1.     The cellulosic waiver cannot be exercised after-the-fact simply because it is "mandatory"........27

iv

      2.     EPA's ability to issue RFS standards belatedly does not mean EPA can belatedly waive the cellulosic biofuel volume .................................................28

      3.     EPA's past cellulosic waivers do not support its current position ..................................................................31

II.     EPA Improperly Used RINs Available for Compliance, Rather Than Volumes Produced, as the Trigger for the Cellulosic Waiver......33

III.    EPA Acted Arbitrarily and Capriciously in Retroactively Exercising its Cellulosic Waiver Authority.............................................37

CONCLUSION....................................................................................43

CERTIFICATE OF COMPLIANCE................................................45

CERTIFICATE OF SERVICE..........................................................46

STATUTORY ADDENDUM

# TABLE OF AUTHORITIES[*]

**Page(s)**

**Cases**

*Alon Refining Krotz Springs, Inc. v. EPA,*
  936 F.3d 628 (D.C. Cir. 2019)......................................6-8, 15, 19, 20

*Am. Petroleum Inst. v. EPA,*
  706 F.3d 474 (D.C. Cir. 2013).................................................22

*\*Ams. for Clean Energy v. EPA,*
  864 F.3d 691 (D.C. Cir. 2017) .........................17-20, 22, 24, 29, 30, 34, 37, 42

*Barnhart v. Peabody Coal Co.,*
  537 U.S. 149 (2003).................................................17, 27, 28, 30

*Bowen v. Georgetown Univ. Hosp.,*
  488 U.S. 204 (1988).................................................18

*Brock v. Pierce Cnty.,*
  476 U.S. 253 (1986).................................................20, 27, 28

*Coal. for Renewable Nat. Gas v. EPA,*
  108 F.4th 846 (D.C. Cir. 2024) .................................................16, 41

*In re Ctr. for Auto Safety,*
  793 F.2d 1346 (D.C. Cir. 1986).................................................18, 24

*Ctr. for Biological Diversity v. EPA,*
  141 F.4th 153 (D.C. Cir. 2025) .................................................10, 11

*DHS v. Regents of Univ. of Cal.,*
  591 U.S. 1 (2020).................................................37

*Dolan v. United States,*
  560 U.S. 605 (2010).................................................17, 24, 27

---

[*] Authorities upon which we chiefly rely are marked with asterisks.

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009)..................................................................38, 43

*FCC v. Prometheus Radio Project*,
  592 U.S. 414 (2021)........................................................................37

*Gen. Motors Corp. v. United States*,
  496 U.S. 530 (1990).......................................................................19

*Growth Energy v. EPA*,
  5 F.4th 1 (D.C. Cir. 2021)...............................................................9

*Jewell v. United States*,
  749 F.3d 1295 (10th Cir. 2014).....................................................30

*Linemaster Switch Corp. v. EPA*,
  938 F.2d 1299 (D.C. Cir. 1991).....................................................28

*Loper Bright Enters. v. Raimondo*,
  603 U.S. 369 (2024)..................................................................16, 31

*\*Monroe Energy, LLC v. EPA*,
  750 F.3d 909 (D.C. Cir. 2014)....................................7, 23, 25, 29, 34

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto.*
  *Ins. Co.*, 463 U.S. 29 (1983) ..........................................................37

*Nat'l Lifeline Ass'n v. FCC*,
  921 F.3d 1102 (D.C. Cir. 2019).....................................................42

*Nat'l Petrochemical & Refiners Ass'n v. EPA*,
  630 F.3d 145 (D.C. Cir. 2010).................................7, 8, 21, 28, 29

*Sierra Club v. Whitman*,
  285 F.3d 63 (D.C. Cir. 2002).........................................................18

*Sierra Pacific Indus. v. Lyng*,
  866 F.2d 1099 (9th Cir. 1989)...................................................28, 30

*\*Sinclair Wyo. Refining Co. LLC v. EPA*,
  101 F.4th 871 (D.C. Cir. 2024)..........................9, 18, 33, 35, 36, 38

vii

## Statutes

42 U.S.C. § 7545(c)(1) ................................................................19

42 U.S.C. § 7545(c)(4)(B) .......................................................12, 19

42 U.S.C. § 7545(o) ..................................................................5

42 U.S.C. § 7545(o)(1)(E) ............................................................6

42 U.S.C. § 7545(o)(2)(A)(i) .....................................................5, 37

42 U.S.C. § 7545(o)(2)(B) ............................................................6

42 U.S.C. § 7545(o)(2)(B)(i)(I) ......................................................9

42 U.S.C. § 7545(o)(2)(B)(i)(III) .................................................6, 10

42 U.S.C. § 7545 (o)(2)(B)(ii) .......................................................6

42 U.S.C. § 7545(o)(3)(A) ...........................................................35

42 U.S.C. § 7545(o)(3)(B)(i) .........................................................7

42 U.S.C. § 7545(o)(5)(D) ...........................................................23

42 U.S.C. § 7545(o)(7) ..............................................................21

*42 U.S.C. § 7545(o)(7)(A) .....................................................19, 21, 35

42 U.S.C. § 7545(o)(7)(A)(i) ......................................................8, 22

*42 U.S.C. § 7545(o)(7)(D)(i) ..........................8-10, 12, 14, 18, 19, 34, 36

42 U.S.C. § 7545(o)(7)(D)(ii) ......................................................9, 26

42 U.S.C. § 7545(o)(9)(B) ........................................................19, 24

42 U.S.C. § 7607(b)(1) ..............................................................4

42 U.S.C. § 7607(d)(9)(A) ..........................................................16

42 U.S.C. § 7607(d)(9)(C) ..........................................................16

42 U.S.C. § 7607(d)(9)(D) ..................................................................16

Energy Independence and Security Act of 2007, Pub. L. No. 110-140, preamble, 121 Stat. 1492 ...............................................5, 24

**Rules and Regulations**

40 C.F.R. § 80.1429 ...........................................................................26

40 C.F.R. § 80.1456 ...........................................................................15

40 C.F.R. § 80.1456(b) .........................................................................9

79 Fed. Reg. 25025 (May 2, 2014) ...............................................31, 32

80 Fed. Reg. 77420 (Dec. 14, 2015) ...................................................32

87 Fed. Reg. 39600 (July 1, 2022)........................................................32

88 Fed. Reg. 44468 (July 12, 2023)......................................... 6, 8-10, 33

89 Fed. Reg. 100442 (Dec. 12, 2024) .............................................11, 23

*90 Fed. Reg. 29751 (July 7, 2025)......... 4, 9, 11, 12, 15, 19, 20, 27, 28, 31, 33, 34

**Other Authorities**

*Projected* (def. 2), *Webster's Third New Int'l Dictionary* (2002).....................19

## GLOSSARY OF ABBREVIATIONS

EPA             Environmental Protection Agency

RFS             Renewable Fuel Standard

RIN             Renewable Identification Number

RNG             Renewable Natural Gas

RTC             Response to Comment

## INTRODUCTION

The Clean Air Act's Renewable Fuel Standard (RFS) is a market-forcing regulatory program designed to promote cleaner sources of fuel and to ensure energy independence. The RFS requires the fuel industry to incorporate increasing volumes of several different categories of renewable fuels into the Nation's transportation fuel supply each year. One of those categories is cellulosic biofuel, which Congress sought to aggressively grow because of its markedly lower greenhouse gas emissions.

For 2023 and beyond, the statute requires EPA to establish annual volume requirements for each category of renewable fuels based on a series of factors, including projected production of renewable fuels. EPA then derives from those volume requirements percentage standards for refiners and importers of petroleum-based gasoline and diesel fuel. The percentage standards dictate how much renewable fuel each refiner or importer must introduce to ensure that the volume requirements are met.

By statute, EPA must set the required volumes at least 14 months before the compliance year begins. EPA then establishes the percentage standards no later than one month before the compliance year begins—*i.e.*, by the end of November. By the same deadline, EPA is also supposed to revisit

1

the volume requirement for cellulosic biofuels based on current projected production, under what is referred to as the cellulosic waiver provision. That provision is the subject of this appeal.

For the 2024 compliance year, EPA missed the statutory deadline to set the volumes. Instead of establishing the required volumes by the end of October 2022 and the percentage standards by the end of November 2023, the agency set both the required volumes and percentage standards in July 2023. EPA projected production of cellulosic biofuels and determined the volume it set to be reasonable and achievable. It did not use the cellulosic waiver. November 2023 came and went, as did nearly all of 2024, with refiners and importers and the cellulosic biofuel industry relying on these volume requirements.

Then, in December 2024, EPA proposed to retroactively reduce the required volume of cellulosic biofuel for 2024. EPA principally proposed to invoke the so-called "general waiver," which permits a reduction for inadequate supply. But as an alternative, EPA asked whether it could rely on the cellulosic waiver. The renewable fuel industry objected, explaining that EPA should not use either waiver. As the industry explained, implementing a retroactive waiver, with the compliance year nearly over, would disrupt settled

2

expectations of the industry, undermine the goals of the RFS, and impair future investment in renewable fuels—as EPA had previously found on several occasions. EPA ignored these pleas and, in an about face, exercised the cellulosic waiver in July 2025, six months after the compliance year ended, reducing the required volume of cellulosic biofuel to the number of 2024 cellulosic biofuel RINs available for compliance.

In issuing that waiver, EPA exceeded its statutory authority and acted arbitrarily and capriciously. The cellulosic waiver affords EPA a one-time opportunity to update projected production *before* a compliance year. It does not authorize EPA to retroactively reduce the volume requirement to track actual production after the year closes. The RFS is designed to be forward-looking and market-forcing. It is inevitable, of course, that EPA will sometimes misjudge production for a particular year. Congress established release valves to address that inevitability. Obligated parties that are unable to obtain sufficient renewable fuels because of a shortage in production—rather than their own strategic compliance choices—can always carry over a deficit to the next year. And in extraordinary circumstances, EPA can exercise the general waiver to reduce the volume requirement because of inadequate supply.

But nothing in the statute permits EPA to turn back the clock to conform the required volume to market results. Such hindsight regulation would allow—indeed, encourage—obligated parties to play the system, postponing compliance with the expectation that the agency will lower the required volumes. That gamesmanship in turn deters investments in renewable fuels, directly contrary to the program's goals. The Court cannot and should not countenance that counterproductive approach.

The Court should grant the petition for review and vacate the waiver.

## JURISDICTIONAL STATEMENT

This petition for review challenges EPA's decision in *Renewable Fuel Standard (RFS) Program: Partial Waiver of the 2024 Cellulosic Biofuel Volume Requirement*, 90 Fed. Reg. 29751 (July 7, 2025). This Court has jurisdiction, and the petition was timely filed. 42 U.S.C. § 7607(b)(1).

## STATEMENT OF ISSUES

1.    Whether EPA exceeded its authority or acted arbitrarily in retroactively using the cellulosic waiver to reduce the cellulosic biofuel volume requirement for 2024.

4

2.     Whether EPA exceeded its authority or acted arbitrarily in relying on compliance credits created for cellulosic biofuel, rather than production of cellulosic biofuel, in exercising the cellulosic waiver.

## STATUTES AND REGULATIONS

Relevant statutes and regulations appear in an addendum to this brief.

## STATEMENT OF THE CASE

### A.    Renewable Fuel Standard

Established by Congress in 2005 and expanded in 2007, the RFS is designed to increase the volume of renewable fuels—like renewable natural gas derived from organic wastes—in the domestic transportation fuel market. 42 U.S.C. § 7545(*o*).  The goal is "to increase the production of clean renewable fuels" and "[t]o move the United States toward greater energy independence and security."  Energy Independence and Security Act of 2007 (EISA), Pub. L. No. 110-140, preamble, 121 Stat. 1492.  EPA is tasked with ensuring that minimum amounts of renewable fuels are sold or introduced into the transportation fuel market each year.  42 U.S.C. § 7545(*o*)(2)(A)(i), (3)(B)(i).

The Clean Air Act establishes a two-step process to achieve that goal. First, although Congress set the goals for several years, for 2023 and beyond, it is up to EPA to set the required volumes—referred to as the "applicable

5

volumes"—for four categories of renewable fuels. 42 U.S.C. § 7545(*o*)(2)(B); *see Alon Refining Krotz Springs, Inc. v. EPA*, 936 F.3d 628, 634 (D.C. Cir. 2019). One category is cellulosic biofuel, a type of "advanced biofuel" derived from cellulosic materials (typically wastes) that has at least 60 percent reduction in lifecycle greenhouse gas emissions compared to the baseline petroleum fuel. 42 U.S.C. § 7545(*o*)(1)(E). Congress sought to ambitiously grow cellulosic biofuel volumes under the RFS. *See id.* § 7545(*o*)(2)(B)(i)(III). Renewable natural gas was approved as a cellulosic biofuel in 2014 and has comprised the vast majority of that category since. 88 Fed. Reg. 44468, 44481 (July 12, 2023) (JA__).

When setting the applicable volumes, EPA must consider various factors, including "the expected annual rate of future commercial production of renewable fuels" and "the impact of renewable fuels on the energy security of the United States" and "on the environment." 42 U.S.C. § 7545 (*o*)(2)(B)(ii). These volumes are to be set "no later than 14 months before the first year for which such applicable volume will apply." *Id.*

Second, EPA "translates" the volume requirements into "percentage standards," by dividing the volume requirement for each renewable fuel by an estimated amount of gasoline and diesel that will be introduced into commerce

in the compliance year. *Alon Refining*, 936 F.3d at 636; s*ee Monroe Energy, LLC v. EPA*, 750 F.3d 909, 912 (D.C. Cir. 2014). Each petroleum refinery and importer—the so-called "obligated parties"—is then required to "ensure that the volume of non-renewable fuel it sells or introduces into U.S. commerce is matched by selling or introducing a corresponding volume of each category of renewable fuel at the level EPA's percentage standard requires for that category." *Alon Refining,* 936 F.3d at 637; *accord Nat'l Petrochemical & Refiners Ass'n v. EPA*, 630 F.3d 145, 148 (D.C. Cir. 2010). The percentage standards are to be set shortly before the start of the compliance year—"[n]ot later than November 30." 42 U.S.C. § 7545($o$)(3)(B)(i).

Compliance is tracked through "Renewable Identification Numbers," or RINs. *Monroe Energy, LLC*, 750 F.3d at 912-13. RINs are assigned to "each batch of renewable fuel that is produced or imported for use in the United States," and the number assigned "corresponds to the amount of … energy per gallon in that batch," scaled to ethanol. *Alon Refining*, 936 F.3d at 637. Upon certain actions that, according to EPA, confirm the fuel's use as transportation fuel, "RINs become 'separated,' meaning they are, in effect, a form of compliance credit." *Id.* For renewable natural gas, for example, the majority of RINs in 2024 were generated and separated at the same time,

when renewable natural gas was dispensed into motor vehicles as compressed natural gas or liquified natural gas. 88 Fed. Reg. 44523 (JA__).

Obligated parties retire RINs each year to prove compliance. *Alon Refining*, 936 F.3d at 637. Parties with "more RINs than they need may sell or trade their excess, or they may 'bank' those RINs for use to meet up to 20 percent of their obligations for the following compliance year." *Id.* at 638. Those without enough RINs to satisfy their compliance obligations may purchase RINs, use "banked RINs" from the year before, or within certain limits "carry a deficit forward to the following year." *Id.*

"[I]n limited circumstances," EPA may reduce the required volumes of renewable fuel for a given year. *Nat'l Petrochemical*, 630 F.3d at 149. The general waiver permits EPA to reduce the required volume for any category after determining that "there is an inadequate domestic supply" or that "implementation of the requirement would severely harm the economy or environment." 42 U.S.C. § 7545(*o*)(7)(A)(i)-(ii). The cellulosic waiver provides that EPA "shall reduce the applicable volume" for cellulosic biofuels "to the projected volume available" if by November 30 prior to the start compliance year, "the projected volume of cellulosic biofuel production is less than the minimum applicable volume established" for that upcoming year. *Id.*

8

§ 7545(*o*)(7)(D)(i); *see Sinclair Wyo. Refining Co. LLC v. EPA*, 101 F.4th 871, 878 (D.C. Cir. 2024). "Put simply, … EPA may require by regulation no more cellulosic biofuel than the market is projected to provide in any given year." *Growth Energy v. EPA*, 5 F.4th 1, 9 (D.C. Cir. 2021).

By statute, if the cellulosic waiver is exercised, obligated parties are also given the option to purchase "cellulosic biofuel credits" from EPA to prove compliance, rather than retiring RINs purchased from renewable fuel producers. 42 U.S.C. § 7545(*o*)(7)(D)(ii). Unlike RINs, which reflect renewable fuel incorporated into transportation fuel, the cellulosic credits are just that—a compliance mechanism that allows an obligated party to satisfy the year's obligation. 40 C.F.R. § 80.1456(b). For 2024, cellulosic RINs averaged $3.11. 90 Fed. Reg. 29756 (JA__). By contrast, the cellulosic credit cost $1.61. *Id.* at 29757 (JA__).

Congress's goals for the RFS are ambitious. The statutory volume requirements peaked at 36 billion gallons in renewable fuels in 2022. 42 U.S.C. § 7545(*o*)(2)(B)(i)(I). Congress particularly sought "to provide a significant incentive for cellulosic biofuels," and, after 2015, cellulosic biofuel was supposed to be "the focus." 88 Fed. Reg. 44512 (JA__). Congress expected there to be at least 16 billion gallons of cellulosic biofuel pushed into the market

9

in 2022. 42 U.S.C. § 7545(*o*)(2)(B)(i)(III). Although the cellulosic biofuel market has not yet "reached the levels envisioned by Congress," EPA has a mandate to support "the ongoing development and commercial scale deployment of cellulosic biofuels, and to continue to build towards the Congressional target" set in the statute. 88 Fed. Reg. 44512 (JA__).

## B.    The Present Waiver

This case involves the cellulosic biofuel requirement for 2024. Although EPA was supposed to establish the 2024 volume requirements by November 2022, it did not do so until July 2023. 88 Fed. Reg. 44478 (JA__); *see Ctr. for Biological Diversity v. EPA*, 141 F.4th 153, 184 (D.C. Cir. 2025). It set the percentage standards at the same time. 88 Fed. Reg. 44471 (JA__). Based on its production projections, EPA set the volume requirement for cellulosic biofuels at 1.09 billion cellulosic RINs, deeming this requirement "achievable," and set the percentage standard accordingly. *Id.* at 44470, 44477 (JA__, JA__). Because EPA set the volume requirement equal to the "the projected volume of cellulosic biofuel production," 42 U.S.C. § 7545(*o*)(7)(D)(i), EPA had no occasion to exercise the cellulosic waiver. 88 Fed. Reg. 44470, 44491-92 (JA__, JA__-__). Petroleum interests challenged the 2024 standards, and this Court upheld them as reasonable. *Ctr. for Biological Diversity*, 141 F.4th at 183-88.

10

Nevertheless, in December 2024, at the end of the compliance year, EPA proposed retroactively reducing the volume of cellulosic biofuel by 120 million RINs.  89 Fed. Reg. 100442 (Dec. 12, 2024) (JA__).  EPA suggested using the general waiver to do so, though it sought comment on the cellulosic waiver as an "alternative."  *Id.* at 100443 (JA__).  Petitioner Coalition for Renewable Natural Gas ("RNG COALITION") and other commenters objected to reducing the volume on either basis.  EPA-HQ-OAR-2024-0411-0030 (JA__-__).  RNG COALITION explained that EPA had not established the statutory prerequisites for a general waiver.  *Id.* at 2 (JA__).  As for a cellulosic waiver, RNG COALITION observed that it was well past the November 2023 deadline for such a waiver and explained that the authority could not be exercised *retroactively*.  *Id.* at 16 (JA__).

Over these objections, EPA reduced the 2024 volume requirement for cellulosic biofuel in July 2025, relying on the cellulosic waiver.  90 Fed. Reg. 29751 (July 7, 2025) (JA__).  Ignoring whether sufficient renewable natural gas was *produced*, EPA calculated that only 1.01 billion cellulosic RINs had been generated in 2024—80 million RINs less than the 1.09 billion requirement.  *Id.* at 29752, 29755 (JA__, JA__). So EPA retroactively reduced the requirement to the 1.01 billion cellulosic RINs generated in 2024.  EPA

11

recognized that it was acting "after the deadline articulated in the statute." *Id.* at 29754 (JA__). But it reasoned, despite that failure, it had a "mandatory" obligation to exercise the cellulosic waiver whenever actual RIN generation falls short. *Id.* at 29752 (JA__). This petition for review followed.

## SUMMARY OF ARGUMENT

I.   EPA lacks the statutory authority to retroactively exercise the cellulosic waiver past the statutory deadline to reduce a reasonably set volume to match actual production for that year, as the statute's text, structure, and purpose all confirm. Plainly read, the cellulosic waiver serves a narrow role, permitting EPA to make a one-time adjustment to its estimated cellulosic volumes going into the compliance year. To that end, EPA must exercise the cellulosic waiver—if it does at all—"not later than November 30 of the preceding calendar year." 42 U.S.C. § 7545(*o*)(7)(D)(i). That date certain must be taken seriously, especially because elsewhere in the statute Congress permitted the agency to act "at any time." *Id.* § 7545(c)(4)(B). Mirroring this prospective focus, the statute ties the waiver to the "*projected* volume" of cellulosic biofuel, not actual RINs generated.

The statute's structure and purpose confirm this. The RFS designates two release valves: If a particular obligated party cannot obtain sufficient

12

RINs, it may carry over a deficit. And if actual production falls short, EPA can use the general waiver to reduce the required volumes. The cellulosic waiver cannot be distorted to replace these options. Doing so would defeat the market-forcing purpose of the RFS, disrupting reliance interests of renewable fuel producers and allowing obligated parties to postpone compliance in the hope that EPA will retroactively reduce the volumes.

EPA suggests that it must exercise the waiver retroactively because the waiver is "mandatory." But the fact that EPA must exercise the waiver based on a *prospective* shortfall apparent as of November 30 does not permit EPA to exercise the waiver *retrospectively* once the compliance year is almost over. EPA also emphasizes that it has the authority to set volumes late, past the statutory deadline, so long as it does so reasonably. That authority cannot be extended here. EPA must set volumes to keep the RFS running; otherwise, there are no requirements for obligated parties to purchase or incorporate renewable fuels. Nothing in the statute suggests that Congress intended those requirements to go dormant if EPA missed the deadlines. The opposite is true for the cellulosic waiver. Exercising the waiver past the deadline undermines the RFS, rather than implementing it.

II.   Even if EPA could exercise the cellulosic waiver retroactively, it relied on the incorrect trigger here.   The cellulosic waiver can only be exercised if "the projected volume of cellulosic biofuel *production* is less than the" required volume.  42 U.S.C. § 7545(*o*)(7)(D)(i) (emphasis added).  Yet EPA deemed the waiver triggered here based on a purported shortfall in RINs, not on actual volumes produced.  That misreads the plain text of the statute, which is focused on volumes estimated to be produced, not compliance credits likely to be available.  Here, it also confuses supply with demand, allowing obligated parties to reduce their obligations by simply purchasing less renewable fuel.

III.  EPA's retroactive exercise of the cellulosic waiver is also arbitrary and capricious.  The waiver is neither reasonable nor reasonably explained. The RFS is market-forcing, intended to put pressure on obligated parties to promote the development of renewable fuels in the transportation industry. Retroactively reducing the volumes after the compliance year defeats the whole point of the RFS, as EPA previously recognized in declining to waive earlier volumes based on purported shortfalls after the compliance year. Those prior concerns are as prevalent today, yet EPA ignores them.

**STANDING**

RNG COALITION has standing because the waiver harms the RNG COALITION's members by reducing demand for their product. *See Alon Refining*, 936 F.3d at 664-65. RNG COALITION represents the entire supply chain for renewable natural gas. EPA-HQ-OAR-2024-0411-0030, at 1 (JA__). Renewable natural gas comprises nearly all cellulosic biofuels and all cellulosic RINs used to meet the RFS's requirements. *Id.* (JA__). The belated waiver permits obligated parties to purchase cellulosic waiver credits from EPA to meet their 2024 volume requirements, rather than purchasing RINs from RNG COALITION's members. 40 C.F.R. § 80.1456. The credits "reduce demand for cellulosic RINs" and, by extension, "decrease cellulosic RIN prices," as EPA has acknowledged. 90 Fed. Reg. 29756 (JA__). These reductions not only impose immediate financial harm on those members participating in the program but also impair downstream investments made in reliance on the volume requirements, as members have detailed. *See, e.g.*, EPA-HQ-OAR-2024-0411-0055 at 46-48 (JA__-JA__), 52-54 (JA__-JA__); EPA-HQ-OAR-2024-0411-0043 at 2 (JA__). Individual participation of members is not required, as the legal issues apply uniformly across RNG COALITION's members.

15

**STANDARD OF REVIEW**

This Court "must ensure that EPA acted within its statutorily assigned role," and confirm that EPA's actions are not "arbitrary, capricious, an abuse of discretion," or "without observance of procedure required by law." *Coal. for Renewable Nat. Gas v. EPA*, 108 F.4th 846, 852 (D.C. Cir. 2024); 42 U.S.C. § 7607(d)(9)(A), (C), (D). In interpreting the Clean Air Act, this Court must adopt "the best reading" of the statute, relying on "the traditional tools of statutory construction." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400, 403 (2024). No deference is due an agency's interpretation, especially a novel one because, unlike courts, "agencies have no special competence in resolving statutory ambiguities." *Id.* at 400-01.

**ARGUMENT**

I.    **The Clean Air Act Does Not Permit EPA to Retroactively Exercise the Cellulosic Waiver.**

EPA exceeded its statutory authority in using the cellulosic waiver after the statutory deadline—and after the compliance year—to retroactively reduce the cellulosic biofuel requirement to match actual production. The cellulosic waiver is designed to operate on a prospective basis in the months before the compliance year based on projected volumes. It was a safety valve to provide some protection to fuel companies in the event that the Clean Air

16

Act's ambitious goals for cellulosic biofuels were overly optimistic (which they were), while maintaining the market-forcing nature and function of the volume requirements and RFS standards.

EPA's failure to meet the statutory deadlines for fulfilling its obligations under the RFS and for determining whether a cellulosic waiver is warranted does not give the agency license to later exercise that waiver in a manner that is antithetical to the RFS program's goals. An agency's failure to meet a statutory deadline "represent[s] a default on statutory duty." *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 157 (2003). In determining "the consequence of tardiness" and assessing if Congress nonetheless intended to allow the agency to act past the deadline, courts must look to the "statutory language," "relevant context," and "the purposes a time limit is intended to serve." *Id.*; *Dolan v. United States*, 560 U.S. 605, 610 (2010). Here, "the text, structure, and purpose of the Renewable Fuel Program," *Ams. for Clean Energy v. EPA*, 864 F.3d 691, 707 (D.C. Cir. 2017), make clear that EPA cannot exercise the cellulosic waiver to retroactively reduce the cellulosic biofuel volume requirement.

17

### A.     The statute's text proves that the cellulosic waiver can only be used prospectively.

The text of the cellulosic waiver provision "all but resolves this issue." *Ams. for Clean Energy*, 864 F.3d at 709.  The provision states that "not later than November 30 of the preceding calendar year" of an RFS standard, if "the projected volume of cellulosic biofuel production is less than the minimum applicable volume," EPA "shall reduce the applicable volume of cellulosic biofuel required … to the projected volume available during that calendar year." 42 U.S.C. § 7545(*o*)(7)(D)(i).  On its face, it authorizes a one-time check of the cellulosic biofuel volume requirement based on the most recent "forecast[]" heading into the compliance year.  *Sinclair Wyo. Ref. Co.*, 101 F.4th at 895.  Nothing in that "language suggest[s] that Congress intended to give EPA the unusual ability to implement rules retroactively."  *Sierra Club v. Whitman*, 285 F.3d 63, 68 (D.C. Cir. 2002); *see Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) ("Retroactivity is not favored in the law."). And, indeed, two textual aspects of the waiver provision confirm its prospective-only application.

First, and most obvious, is the statute's designation of "a specific deadline" for exercising the waiver.  *In re Ctr. for Auto Safety*, 793 F.2d 1346, 1353 (D.C. Cir. 1986).  If EPA is to exercise the waiver, it must do so "not later

18

than November 30 of the preceding calendar year." 42 U.S.C. § 7545(*o*)(7)(D)(i). That fixed date stands in stark contrast to other places in the statute where EPA is permitted to act "from time to time," 42 U.S.C. § 7545(c)(1), or "at any time," *id.* § 7545(c)(4)(B), (*o*)(9)(B).

Had Congress wanted to give EPA the power to reduce the cellulosic volume requirement beyond the statutory deadline, "it knew how to" do so. *Alon Refining*, 936 F.3d at 657; *accord Ams. for Clean Energy*, 864 F.3d at 708. The statute contains another waiver, the general waiver, that contains no date certain to act. *See* 42 U.S.C. § 7545(*o*)(7)(A). Function aside (*see* pp. 21-23, *infra*), the mere fact that Congress imposed a deadline for one waiver but not the other is a strong indication that Congress intended the deadline it imposed to have meaning. *Gen. Motors Corp. v. United States*, 496 U.S. 530, 537-38 (1990).

Second, the provision keys the waiver to the "projected volume" of cellulosic biofuel to be produced, not to the actual volume produced. "Projected" is a "forward-looking" adjective. 90 Fed. Reg. 29754 (JA__). It looks to the "future." *Projected* (def. 2), *Webster's Third New Int'l Dictionary* (2002). In setting the volume requirements, "EPA must make its own projection of the volume of cellulosic biofuel that *will be produced* in the

19

following year." *Alon Refining*, 936 F.3d at 636 (emphasis added). And EPA itself has "consistently interpreted the 'projected volume available' as 'the volume of qualifying cellulosic biofuel projected *to be* produced or imported and available for use." 90 Fed. Reg. 29755 (JA__) (emphasis added). Once the compliance year is over, as here, there is no longer a "projected volume of cellulosic biofuel production," but an actual volume produced.

The statute's text alone thus makes clear that Congress did not set a deadline merely "to spur the [agency] to action," but instead "to limit the scope of [EPA's] authority" to exercise the waiver. *Brock v. Pierce Cnty.*, 476 U.S. 253, 265 (1986). The waiver permits obligated parties and cellulosic biofuel producers to go into the compliance year with reasonable volume requirements based on the most up-to-date projections. Nothing about that narrow authority gives the agency the "boundless" power to reduce the volume requirement past the statutory deadline, much less after the compliance year is nearly over or well into the next compliance year, as EPA did here. *Ams. for Clean Energy*, 864 F.3d at 711.

**B.    The statute's structure confirms that the cellulosic waiver is prospective.**

The prospective-only limitation on EPA's cellulosic-waiver authority is confirmed by the structure of the Act and related provisions.  *See Nat'l Petrochemical*, 630 F.3d at 154.

1.  Consider, again, the distinctions between the two avenues for EPA to reduce volumes once they have been set—the cellulosic waiver and the general waiver.  42 U.S.C. § 7545(*o*)(7).  The two waivers have different limitations.  The general waiver permits EPA to reduce the volume requirement for any category of renewable fuel based on, among other things, a determination by the agency that "there *is* an inadequate domestic supply," 42 U.S.C. § 7545(*o*)(7)(A) (emphasis added), not merely a judgment about future "project[ions]."  And unlike the cellulosic waiver and its November 30 deadline, the general waiver contains no date certain.  Instead, EPA is authorized to exercise the general waiver "on petition by one or more States, by any person subject to [the Act], or by the Administrator on his own motion … after public notice and … comment." *Id.*

The two waivers also serve different functions.  The cellulosic waiver permits EPA to update the volume requirements immediately before the start of the compliance year based on the most recent projections of production.

21

When Congress established the cellulosic biofuel category in 2007, commercial production of cellulosic biofuel was less advanced than other renewable fuels, so there could be more volatility in production estimates for that category. *See Am. Petroleum Inst. v. EPA*, 706 F.3d 474, 479 (D.C. Cir. 2013). Congress permitted EPA to perform a one-time reduction of cellulosic biofuel requirements—and only that category—to reflect that uncertainty. This single opportunity to update the volume requirement is intended to address potential commercial barriers to production going into a compliance year, not remedy after-the-fact shortfalls

The general waiver, by contrast, provides a broader release valve that is not tied to any one category or any production estimates for the upcoming compliance year. Instead, the general waiver authorizes reductions where compliance "would be infeasible" because "there is an inadequate domestic supply" to meet the requirement or compliance "would severely harm the economy or environment." *Ams. for Clean Energy*, 864 F.3d at 708; 42 U.S.C. § 7545(*o*)(7)(A)(i)-(ii). To be sure, EPA must still exercise this authority within a reasonable time. *See Ams. for Clean Energy*, 864 F.3d at 721. But it is the general waiver, not the cellulosic waiver, that is intended to permit EPA to

forgive shortfalls in actual production—so long as in exercising that waiver EPA does not undermine the purposes of the RFS.

EPA's reading of the cellulosic waiver allows the agency—indeed, requires it—to skip the general waiver anytime cellulosic biofuel is involved. When this proceeding began, EPA proposed reducing the cellulosic volume for 2024 based on the general waiver, offering the cellulosic waiver only as an "alternative." 89 Fed. Reg. 100443 (JA__). But the agency has now concluded it *must* reduce the cellulosic volume any time actual production falls short of the agency's estimates. If that were so, it is not clear when EPA would ever or could ever rely on the general waiver to reduce the cellulosic volume requirement.

2. Other aspects of the statute's structure likewise undermine the EPA's approach. To be clear, the statute contemplates that there will be shortfalls in actual production some years—an inevitability in a market-forcing program. *See Monroe Energy*, 750 F.3d at 919. To account for that possibility, Congress provided several release valves. In addition to EPA's authority under the general waiver, a party itself can "carry forward a renewable fuel deficit" as long as it catches up the next year. 42 U.S.C. § 7545(*o*)(5)(D). And small

refineries can ask for an exemption if compliance would cause "disproportionate economic hardship." *Id.* § 7545(*o*)(9)(B).

On EPA's position, these statutory measures would never be needed to address a shortfall in cellulosic biofuel—the intended "focus" of the RFS. The volume requirement will simply (and always) be waived to match the actual production for the year. That is not "how the Renewable Fuel Program is supposed to work." *Ams. for Clean Energy*, 864 F.3d at 710; *see In re Ctr. for Auto Safety*, 793 F.2d at 1348. The cellulosic waiver is designed to provide a prospective correction, not a retrospective release.

## C. The RFS program's purpose requires that the cellulosic waiver be prospective.

Last, but not at all least, not only does EPA's reading contradict the statute's text and structure, it would "defeat the basic purpose" of the RFS, *Dolan*, 560 U.S. at 615, "turn[ing] the Renewable Fuel Program's market forcing provisions on their head," *Ams. for Clean Energy*, 864 F.3d at 712 (internal quotation marks omitted).

The core purpose of the RFS is to "increase the production of clean renewable fuels." Pub. L. No. 110-140, preamble. "Capital expenditures are high for [renewable fuel] projects, and they need long term certainty to ensure a return on investment and to secure financing." EPA-HQ-OAR-2024-0411-

24

0030, at 2 (JA__).  By requiring recalcitrant fuel companies to sell or introduce renewable fuels into the transportation fuel market, the volume requirements provide that needed certainty, ensuring a ready market for the renewable fuel being produced.  EPA-HQ-OAR-2024-0411-0055, at 39-40, 71 (JA__-__, JA__).  That certainty, in turn, "incentivize[s]" further "technology and infrastructure investments and fuel supply diversification." *Monroe Energy*, 750 F.3d at 919.  Further investments permit EPA to increase the requirements for the following year—and the virtuous cycle continues.

Reading the statute to require EPA to retroactively reduce the volume requirement for cellulosic biofuels any time RIN generation that year falls short of projections (even where there are enough RINs available for compliance) would gut that design.  As EPA itself has recognized, if obligated parties know that volume requirements will automatically be decreased after the fact, they can and will choose to sit on their hands, "postpon[ing] acquisition of cellulosic biofuel" and "hop[ing]" for a waiver.  Denial of AFPM Petition for Waiver of 2016 Cellulosic Biofuel Standard at 3 (EPA-HQ-OAR-2024-0411-0006) (JA__) ("2016 Denial"); *accord* Denial of AFPM Petition for Partial Waiver of 2023 Cellulosic Biofuel Standard at 7 (EPA-HQ-OAR-2024-0411-0005) (JA__) ("2023 Denial"); *cf. Monroe Energy*, 750 F.3d at 918

25

(recognizing that "knowledge of the volume requirements … is crucial to the strategies that obligated parties may implement"). This in turn "significantly depress[es] the demand for … cellulosic biofuel and cellulosic biofuel RINs," leading renewable fuel companies to "reduce their production … or cease production altogether." 2016 Denial at 3 (JA__); 2023 Denial at 7 (JA__). And the virtuous cycle becomes a death spiral, undermining the articulated goals of Congress in establishing the RFS.

These harms are only amplified by the cellulosic biofuel credits that are made available whenever EPA exercises the waiver. When issued retroactively, cellulosic credits allow obligated parties to sidestep introducing renewable fuels and instead merely pay the EPA to satisfy compliance for that year—potentially at a substantial discount off the cost of RINs that reflect the actual introduction of renewable fuels into the market. 42 U.S.C. § 7545(*o*)(7)(D)(ii); 40 C.F.R. § 80.1429. Under EPA's approach here, the promise of such discounted compliance increases the obligated parties' incentives for delayed compliance. The program becomes market undermining, not market forcing.

**D.    EPA's contrary justifications are not persuasive.**

None of EPA's stated justifications supports its decision to deviate from the straightforward text and common-sense operation of the statute.

*1.    The cellulosic waiver cannot be exercised after-the-fact simply because it is "mandatory."*

To start, EPA incorrectly assumes that it must retroactively reduce the volume requirement because the cellulosic waiver is "mandatory." 90 Fed. Reg. 29754 (JA__); *cf.* RTC at 5 (EPA-HQ-OAR-2024-0411-0071) (JA__). To be sure, the mere fact that the agency missed a deadline by which it "shall" act does not—"without more"—automatically "preclude action later." *Barnhart*, 537 U.S. at 158. But it does not follow that the passing of a statutory deadline has no impact on an otherwise-mandatory duty. In other words, that the cellulosic waiver must be exercised based on a *prospective* shortfall in estimated production does not automatically mean that it must (or even can) be exercised *retrospectively* based on actual production, after the statutory deadline has passed.

To the contrary, the whole premise of *Barnhart*, *Dolan*, *Brock*, and similar cases is that determining the consequences of an agency's statutory default requires a careful analysis of the text, operation, and purpose of both the deadline and the statutory scheme. Here, the text, structure, and purpose

27

of the RFS all confirm that once the statutory deadline is missed, the Act does not permit EPA, much less impose an ongoing duty, to monitor cellulosic biofuel production and issue retroactive waivers anytime actual production does not meet estimated production. *See* pp. 18-26, *supra*.

> 2.  *EPA's ability to issue RFS standards belatedly does not mean EPA can belatedly waive the cellulosic biofuel volume.*

Next, EPA analogizes to its ability to "issue late standards even when it acts after the statutory deadlines have passed." 90 Fed. Reg. 29754 (JA__). The two are not remotely the same. An obligation to set late standards does not equate to an obligation—or permission—to retroactively undermine them.

a. Despite a clear statutory deadline, an agency may still have the power to carry out mandates that would "thwart the statutory purpose" if unfulfilled. *Sierra Pacific Indus. v. Lyng*, 866 F.2d 1099, 1112 (9th Cir. 1989). The Secretary of Labor can still determine if federal funds have been misused after the deadline for investigating a complaint, *see Brock*, 476 U.S. at 254-55; the Social Security Commissioner can still assign retirees to a retirement plan, *see Barnhart*, 537 U.S. at 752; and EPA can still add hazardous waste sites to its National Priorities List, *see Linemaster Switch Corp. v. EPA*, 938 F.2d 1299, 1301 (D.C. Cir. 1991). In these situations, the agency's failure to meet the

deadline is not read "to limit [its] power to get a mandatory job done." *Nat'l Petrochemical*, 630 F.3d at 154.

In *National Petrochemical* and its progeny, this Court held that EPA's obligation to set volume requirements and percentage standards fits into this category. For the RFS to work at all, EPA must establish the annual volumes and percentage standards; otherwise, obligated parties have no requirement to introduce renewable fuels into the market, "turn[ing] agency delay into a windfall." *Nat'l Petrochemical*, 630 F.3d at 157. The Court rejected the implausible suggestion that "Congress intended for the agency to lose its power" to establish standards if EPA missed the deadline for those standards. *Ams. for Clean Energy*, 864 F.3d at 720 (internal quotation marks omitted).

To the contrary, "Congress directed EPA to 'ensure' that 'at least' the set volumes of renewable fuel were used each year." *Monroe Energy, LLC*, 750 F.3d at 919. "[T]hat directive," plus "the overall statutory scheme and legislative history" makes clear that Congress did not intend to "preclud[e] EPA from fulfilling its statutory mandate" past the deadline. *Id.* at 920. In other words, "Congress' focus [was] on ensuring the annual volume requirement was met regardless of EPA delay." *Nat'l Petrochemical*, 630 F.3d at 163.

b.  That analysis does not apply to a retroactive application of the cellulosic waiver.  Unlike the RFS standards themselves, "[n]o one could seriously argue that the entire scheme would have been nullified" absent a belated exercise of the waiver.  *Barnhart*, 537 U.S. at 162; *see Jewell v. United States*, 749 F.3d 1295, 1299 (10th Cir. 2014).  Quite the opposite.   Failing to update its cellulosic biofuel projections does not prevent EPA from meeting its "mandate" of ensuring that renewable fuels are being introduced into the domestic market.  *Ams. for Clean Energy*, 864 F.3d at 720.  With the volume requirements and standards in place, the statute's purposes are still being served, pushing the market towards greater volumes of renewable fuel with all of Congress's safety valves available where actual production falls short of the applicable volumes.  *See Sierra Pacific*, 866 F.2d at 1112.

Moreover, even with respect to late standards, this Court has made clear that when EPA exercises its authority beyond the statutory deadline, it is only authorized to do so "in a reasonable manner."  *Ams. for Clean Energy*, 864 F.3d at 721.  Against the backdrop of a market-forcing scheme, there is nothing reasonable about retroactively waiving the cellulosic biofuel volume requirement to account for a shortfall in actual production—much less in claiming that the statute *requires* such a self-defeating result.   That is

particularly true where the volume requirement itself was based on projections issued only six months (rather than the statutorily mandated 14 months) before the compliance year began.

3.    *EPA's past cellulosic waivers do not support its current position.*

Finally, EPA claims that it has the power to retroactively exercise the cellulosic waiver authority because it has retroactively reduced the cellulosic biofuels volume in the past.  90 Fed. Reg. 29754 & n.17 (JA__).  As an initial matter, agency authority is not subject to adverse possession.  Even if EPA had previously issued unlawful cellulosic waivers in circumstances like these, it would not justify another attempt.  This Court has never passed on EPA's authority to issue such waivers, much less since the Supreme Court has made clear that the agency's authority is a question for this Court to resolve, without deference to EPA's views.  *See Loper Bright*, 603 U.S. at 400-01.

In any event, none of EPA's examples came close to the scenario here.  In 2013, EPA granted a petition for reconsideration to correct the volume requirement.  79 Fed. Reg. 25025, 25027-28 (May 2, 2014).  The then-main cellulosic biofuel producer had announced "two days after EPA finalized the 2013 rule" that it would be producing significantly fewer gallons than previously calculated.  *Id.* at 25027.  Trade groups promptly moved for

31

reconsideration, and EPA granted the motion and amended the 2013 volume—with no mention of its waiver authority. *See id.* And in 2020, EPA adjusted the volume under its purportedly inherent "power to reconsider" RFS requirements based on "significant and unanticipated events"—namely, "the COVID-19 pandemic, which caused a major drop in transportation fuel demand." 87 Fed. Reg. 39600, 39602, 39609 (July 1, 2022).

The other two examples cited by EPA at least include exercises of the cellulosic waiver, but they do not resemble the agency's action here. Both instances concerned *statutory* cellulosic volume requirements. Recall, Congress set ambitious volume requirements in the statute for 2005 to 2022. For 2014-15 and 2021-22, EPA was late in translating those statutory volumes into percentage standards. 80 Fed. Reg. 77420 (Dec. 14, 2015); 87 Fed. Reg. 39602-03, 39622, 39624. Because production still fell short of the aspirational volumes set in the statute years prior, EPA used waivers to reduce the statutory volumes to reflect estimated production at the same time it set the percentage standards. 80 Fed. Reg. 77440; 87 Fed. Reg. 39606.

In other words, in EPA's claimed precedents, EPA did not apply the cellulosic waiver retroactively at all. It reduced the cellulosic biofuel requirement at the same time it established the percentage standards. And

on top of that, in at least one of those instances, all parties "agree[d] that the waiver was triggered." *Sinclair Wyo.*, 101 F.4th at 883. Even if the EPA's belated exercise of the cellulosic waiver authority was permissible in those cases, they provide no precedent for the waiver at issue here—in which EPA established its own reasonable volume requirement (based on projected production) *before* the compliance year based on accurate estimates and chose only *after* the compliance year to retroactively reduce those requirements.

## II.    EPA Improperly Used RINs Available for Compliance, Rather Than Volumes Produced, as the Trigger for the Cellulosic Waiver.

EPA committed an independent statutory error in determining that the cellulosic waiver was triggered for 2024. The agency improperly tied the waiver to credits available rather than fuel produced, confusing demand with supply.

For 2024, the projected volume of cellulosic biofuel production was equivalent to 1.09 billion gallons. 88 Fed. Reg. 44470 (JA__). EPA used that number to set the required volume. In late 2024, EPA calculated that only 1.01 billion cellulosic RINs had been separated in 2024, meaning that only that many equivalent gallons had been incorporated into transportation fuel. 90 Fed. Reg. 29752, 29755 (JA__, JA__). EPA acknowledged that both "production capacity" and the "total quantity of RNG produced" were

33

"higher" than that.  RTC at 8 (JA__).  But because only 1.01 billion cellulosic RINs were separated and available for compliance, EPA deemed the cellulosic waiver triggered and necessary.  90 Fed. Reg. 29752 (JA__).

That was error.  EPA may exercise the cellulosic waiver only if "the projected volume of cellulosic biofuel *production* is less than the minimum applicable volume."  42 U.S.C. § 7545(*o*)(7)(D)(i) (emphasis added).  Cellulosic biofuel "production" is not equivalent to the number of RINs generated.  Production reflects supply, the amount of renewable fuel that is available for use.  The RINs used by EPA here—generally, separated RINs—reflect demand, as they became available whenever renewable fuel is actually *used* in transportation.  The statute is concerned with supply, or "actual production," not demand.  *Monroe Energy*, 750 F.3d at 913; *cf.* RTC at 4, 8 (JA__, JA__).  "Whether there is an adequate amount of renewable fuel available to allow refiners … and importers to meet the statutory volume requirements" is not the same as whether there are an adequate number of credits available to show compliance.  *Ams. for Clean Energy*, 864 F.3d at 710 (rejecting EPA's attempt to consider "demand" when assessing "inadequate domestic supply" for purposes of the general waiver).

34

The statute's focus on actual volumes, not credits, is reflected in other provisions in the statute.  Each year, the Energy Information Administration must estimate "the volumes of transportation fuel, biomass-based diesel, and cellulosic biofuel projected or sold or introduced into commerce in the United States," not RINs.  42 U.S.C. § 7545(*o*)(3)(A) (emphasis added).  EPA sets the percentage standards based on those national estimates.  *Id.* § 7545(*o*)(3)(A).  Similarly, the general waiver authorizes EPA to reduce "the national quantity of renewable fuel required" by the standards, not reduce the number of credits that must be available for compliance.  *Id.* § 7545(*o*)(7)(A).

This Court rejected a reading of the statute similar to EPA's in *Sinclair Wyoming*.  There, in the last few years of implementing the volumes set by Congress in the statute, EPA used the cellulosic waiver authority to reduce the statutory volumes to the projected volume of production.  101 F.4th at 883.  In calculating "the projected volume available during that calendar year," "EPA did not include carryover cellulosic RINs, which represent the volume produced or imported the previous year but that remains available for compliance for that year."  *Id.* at 883-84.  The renewable fuel industry argued that that this was error.  This Court disagreed.  Under the cellulosic waiver, "EPA must reduce the applicable *volume* of cellulosic biofuel in the statutory

35

table to the projected *volume* available during that calendar year." *Id.* at 884 (emphases added and internal quotation marks omitted). That volume requirement is entirely "separate from" the credit system. *Id.* So "carryover RINs" did not count as "available cellulosic biofuel." *Id.*

To be sure, the *Sinclair* Court noted that, in certain circumstances, there could be a distinction between "projected volume available" and "projected volume of production" calculated under the statute. *Id.* at 885 (internal quotation marks omitted). But that distinction only confirms EPA's error. *Sinclair* emphasized that the "projected volume available" is best read as a "subset" of the "projected volume of production," "allowing EPA to account for situations where some portion of the projected volume of production may not be available to use for compliance." *Id.* (internal quotation marks omitted). By measuring the "volume of production" only based on RINs generated in 2024—that is, based on the amount *both* available to be used *and* actually used—EPA refused to account for such situations here.

EPA disagrees with this plain-text reading, asserting that the agency does not consider it "appropriate" to set the volume requirement based on production, rather than availability for compliance. RTC at 8 (JA__). But that is not EPA's judgment call. Congress has already decided that "production"

36

is the relevant trigger for the waiver. 42 U.S.C. § 7545(*o*)(7)(D)(i). And "the fact that EPA thinks a statute would work better if tweaked does not give EPA the right to amend the statute." *Ams. for Clean Energy*, 864 F.3d at 712. Besides, EPA's concerns are misplaced. The RFS is intended to promote the use of renewable fuels in "transportation," mandating volumes to be introduced into the market. 42 U.S.C. § 7545(*o*)(2)(A)(i). Not all renewable natural gas produced may ultimately "be used as transportation fuel." RTC at 8 (JA__). But that does not mean that Congress meant to limit parties' obligations to those volumes that the market naturally makes available for transportation fuel and reward those parties that fail to do their part to incorporate renewable fuel into the transportation sector.

## III. EPA Acted Arbitrarily and Capriciously in Retroactively Exercising its Cellulosic Waiver Authority.

Even if EPA possessed statutory authority to retroactively use the cellulosic waiver based on RIN availability, its decision to do so here is arbitrary and capricious. Agency action must be "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). The agency must not ignore "an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). It must consider reliance interests. *DHS v. Regents of Univ. of Cal.*,

37

591 U.S. 1, 30 (2020). And if it shifts positions, the agency must not only "display awareness that it is changing position" but, when it has "disregard[ed] facts and circumstances that underlay or were engendered by the prior policy," must "provide a more detailed justification than what would suffice for a new policy created on a blank slate." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009). The cellulosic waiver here fails all these requirements.

A. For all the reasons that a retroactive cellulosic waiver is inconsistent with the RFS's purpose, it was unreasonable for EPA to adopt one here. The RFS is "market forcing," and retroactively reducing the required volumes after the fact undermines the program and Congress' intent. *Sinclair Wyo.*, 101 F.4th at 877; *see* pp. 24-26, *supra*. By its very structure, the RFS "requires that EPA make a forward-looking projection in advance of the compliance year." 2016 Denial at 5 (JA__). Despite the agency's "neutral aim at accuracy," "it is unlikely given the many variables influencing actual production that EPA's projection will ever prove 100% accurate." *Id*. But "[t]he fact that EPA may slightly over-estimate or under-estimate production from year-to-year does not establish that a slight over-estimate creates an unjust 'penalty'" for obligated parties. *Id*.

38

B.    EPA's cellulosic waiver is likewise not reasonably explained, particularly considering EPA's prior statements on the effects of retroactive waivers.  Citing the very concerns expressed here, EPA has previously refused to reduce volumes when actual production fell short of EPA's estimates.  Specifically, EPA declined to waive the 2016 or 2023 cellulosic biofuel volumes based on allegedly inadequate production.  *See* 2016 Denial at 5 (JA__); 2023 Denial at 9-10 (JA__-JA__).  Suddenly, EPA now claims that its prior concerns are not relevant here.  RTC at 7 (JA__).  But its explanations are insufficient and unpersuasive.

First, although EPA has expressed significant concerns about gamesmanship, the agency now posits that obligated parties are unlikely to delay compliance where cellulosic waiver credits are unavailable "as an alternative compliance mechanism," making delay a "higher-risk option." RTC at 7 (JA__).  But no cellulosic waiver credits were available for obligated parties to use for compliance in 2023 either.  2023 Denial at 1 (JA__).  The agency still rightly identified a significant risk that "obligated parties [would] alter future behavior through delaying acquisition of cellulosic biofuel or cellulosic RINs based on the prospective expectation of subsequent waivers." *Id.* at 7 (JA__).

Second, EPA asserts that, even if obligated parties do delay compliance, that recalcitrance is no longer a concern. According to the agency, "the cellulosic biofuel industry has developed significantly in recent years," and "[t]he relatively mature status of the RNG industry, along with the relatively large number of potential buyers for RNG and other cellulosic biofuels" in other industries "reduce[s] the risk that obligated parties would be able to directly influence cellulosic biofuel production by delaying RIN purchases." RTC at 7 (JA__). But EPA took the opposite position *one* year prior, reasoning that delay in purchasing biofuel or RINs could and would "add to the investment risks already experienced by the cellulosic biofuel industry and diminish the potential for the industry's future growth." 2023 Denial at 7 (JA__).

The record bore this out: After EPA proposed retroactively waiving the volume requirement, RIN prices plummeted, "caus[ing] massive financial losses among lenders and investors in renewable fuel." EPA-HQ-OAR-2024-0411-0055 at 46 (JA__). One renewable-fuel company had a $60 million debt financing retracted. *Id.* at 53 (JA__). "[N]ew project development" was "frozen." *Id.*; *see* EPA-HQ-OAR-2024-0411-0043 at 2 (JA__) (one developer

40

noting that it had "raised $400 million last year for RNG projects, but [would be] unable to invest a significant portion of that" due to the waiver).

EPA points to no development in the past year suggesting that the renewable fuel industry is no longer vulnerable to manipulation by obligated parties or offers any other explanation for its change of mind, and RNG COALITION is unaware of any meaningful risk-mitigating development. To the contrary, the most meaningful development in recent years are the increased costs—and thus increased risks—imposed on renewable natural gas producers and the supply chain by EPA itself. *See Coal. for Renewable Nat. Gas*, 108 F.4th at 851-52. EPA made regulatory changes in 2024 that restricted RIN generation for renewable natural gas. Industry explained to EPA that these changes were limiting RIN generation, despite production of renewable natural gas that otherwise would have generated RINs. *See, e.g.,* EPA-HQ-OAR-2024-0411-0043 at 2 (JA__); EPA-HQ-OAR-2024-0411-0021 at 2 (JA__); EPA-HQ-OAR-2024-0411-0052 at 9-10 (JA__); EPA-HQ-OAR-2024-0411-0030 at 8-9 (JA__). "It cannot be that EPA can restrict RIN generation and then claim insufficient RNG supply to utilize the waiver authority." EPA-HQ-OAR-2024-0411-0030 at 9 (JA__). EPA failed to acknowledge these

41

changes, much less recognize that its own conduct could be the cause of the purported shortfall in cellulosic RINs.

C.  In all this, EPA improperly discounted the serious reliance interests held by the renewable fuel industry. *See Ams. for Clean Energy*, 864 F.3d at 718 (reiterating that, even where EPA retains authority to act past a statutory deadline, it must "reasonably consider[] and mitigate[] any hardship caused … by reason of [its] lateness").  The industry requires "[c]ertainty and predictability."  EPA-HQ-OAR-2024-0411-0030, at 2 (JA__).  Because "[c]apital expenditures are high," "long term certainty" is required "to ensure a return on investment and to secure financing." *Id.*; *see* EPA-HQ-OAR-2024-0411-0043, at 1 (JA__) (one industry participant noting that it has "a billion-dollar pipeline of RNG projects" in limbo).  "For those incentives to happen, however, EPA must show that it will, in fact, enforce the volume requirements it sets."  EPA-HQ-OAR-2024-0411-0030, at 2 (JA__).  Reversing course after the renewable fuel industry has acted in reliance on the applicable volumes and on EPA's explanation of the cellulosic waiver decimates those expectations. *See Nat'l Lifeline Ass'n v. FCC*, 921 F.3d 1102, 1114 (D.C. Cir. 2019) (holding that agency acted arbitrarily and capriciously because it failed to "take into account the reliance interests of … providers that had crafted

business models and invested significant resources" based on prior agency policy).

In short, EPA is not writing "on a blank slate." *Fox*, 556 U.S. at 515. Not only are there "serious reliance interests" at stake, but EPA has ignored important aspects of the problem and made bare assertions "that contradict those which underly its prior" refusals to retroactively reduce volume requirements. *Id.* As such, EPA acted arbitrarily and capriciously in exercising the cellulosic waiver.

## CONCLUSION

For these reasons, the petition for review should be granted, and the partial waiver should be vacated.

Dated: February 17, 2026            Respectfully submitted,

/s/ *Jonathan Y. Ellis*
Jonathan Y. Ellis
Grace Greene Simmons
MCGUIREWOODS LLP
888 16th St. N.W.
Suite 500
Washington, D.C. 20006
(202) 828-2887
jellis@mcguirewoods.com
gsimmons@mcguirewoods.com

Sandra P. Franco

FRANCO ENVIRONMENTAL LAW, LLC
600 Pennsylvania Avenue, SE
Unit 15577
Washington, DC 20003
(202) 256-6115
sandra@francoenvironmentallaw.com

*Counsel for Coalition for Renewable Natural Gas*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7) because this brief contains 8,696 words, excluding the parts exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) because this brief has been prepared in a proportionally spaced 14-point CenturyExpd BT font using Microsoft Word.

Dated: February 17, 2026          /s/ *Jonathan Y. Ellis*
                                  Jonathan Y. Ellis

## CERTIFICATE OF SERVICE

I hereby certify that on February 17, 2026, the foregoing was filed electronically with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit using the appellate CM/ECF system.  All participants in the case are registered CM/ECF users and the system will serve them.


Dated: February 17, 2026                    */s/ Jonathan Y. Ellis*
                                            Jonathan Y. Ellis

# Addendum

# TABLE OF CONTENTS

**Page**

42 U.S.C. § 7545(*o*)................................................................A1

40 C.F.R. § 80.1456 ..............................................................A9

(iii) In granting waivers under this subparagraph the Administrator shall consider distribution capacity separately from the adequacy of domestic supply and shall grant such waivers in such manner as will assure that, if supplies of oxygenated gasoline are limited, areas having the highest design value for carbon monoxide will have a priority in obtaining oxygenated gasoline which meets the requirements of paragraph (2).

(iv) As used in this subparagraph, the term distribution capacity includes capacity for transportation, storage, and blending.

#### (4) Fuel dispensing systems

Any person selling oxygenated gasoline at retail pursuant to this subsection shall be required under regulations promulgated by the Administrator to label the fuel dispensing system with a notice that the gasoline is oxygenated and will reduce the carbon monoxide emissions from the motor vehicle.

#### (5) Guidelines for credit

The Administrator shall promulgate guidelines, within 9 months after November 15, 1990, allowing the use of marketable oxygen credits from gasolines during that portion of the year specified in paragraph (2) with higher oxygen content than required to offset the sale or use of gasoline with a lower oxygen content than required. No credits may be transferred between nonattainment areas.

#### (6) Attainment areas

Nothing in this subsection shall be interpreted as requiring an oxygenated gasoline program in an area which is in attainment for carbon monoxide, except that in a carbon monoxide nonattainment area which is redesignated as attainment for carbon monoxide, the requirements of this subsection shall remain in effect to the extent such program is necessary to maintain such standard thereafter in the area.

#### (7) Failure to attain CO standard

If the Administrator determines under section 7512(b)(2) of this title that the national primary ambient air quality standard for carbon monoxide has not been attained in a Serious Area by the applicable attainment date, the State shall submit a plan revision for the area within 9 months after the date of such determination. The plan revision shall provide that the minimum oxygen content of gasoline referred to in paragraph (2) shall be 3.1 percent by weight unless such requirement is waived in accordance with the provisions of this subsection.

### (n) Prohibition on leaded gasoline for highway use

After December 31, 1995, it shall be unlawful for any person to sell, offer for sale, supply, offer for supply, dispense, transport, or introduce into commerce, for use as fuel in any motor vehicle (as defined in section 7554(2)[8] of this title) any gasoline which contains lead or lead additives.

### (o) Renewable fuel program

#### (1) Definitions

In this section:

---

[8] So in original. Probably should be section ''7550(2)''.

#### (A) Additional renewable fuel

The term ''additional renewable fuel'' means fuel that is produced from renewable biomass and that is used to replace or reduce the quantity of fossil fuel present in home heating oil or jet fuel.

#### (B) Advanced biofuel

##### (i) In general

The term ''advanced biofuel'' means renewable fuel, other than ethanol derived from corn starch, that has lifecycle greenhouse gas emissions, as determined by the Administrator, after notice and opportunity for comment, that are at least 50 percent less than baseline lifecycle greenhouse gas emissions.

##### (ii) Inclusions

The types of fuels eligible for consideration as ''advanced biofuel'' may include any of the following:

(I) Ethanol derived from cellulose, hemicellulose, or lignin.

(II) Ethanol derived from sugar or starch (other than corn starch).

(III) Ethanol derived from waste material, including crop residue, other vegetative waste material, animal waste, and food waste and yard waste.

(IV) Biomass-based diesel.

(V) Biogas (including landfill gas and sewage waste treatment gas) produced through the conversion of organic matter from renewable biomass.

(VI) Butanol or other alcohols produced through the conversion of organic matter from renewable biomass.

(VII) Other fuel derived from cellulosic biomass.

#### (C) Baseline lifecycle greenhouse gas emissions

The term ''baseline lifecycle greenhouse gas emissions'' means the average lifecycle greenhouse gas emissions, as determined by the Administrator, after notice and opportunity for comment, for gasoline or diesel (whichever is being replaced by the renewable fuel) sold or distributed as transportation fuel in 2005.

#### (D) Biomass-based diesel

The term ''biomass-based diesel'' means renewable fuel that is biodiesel as defined in section 13220(f) of this title and that has lifecycle greenhouse gas emissions, as determined by the Administrator, after notice and opportunity for comment, that are at least 50 percent less than the baseline lifecycle greenhouse gas emissions. Notwithstanding the preceding sentence, renewable fuel derived from co-processing biomass with a petroleum feedstock shall be advanced biofuel if it meets the requirements of subparagraph (B), but is not biomass-based diesel.

#### (E) Cellulosic biofuel

The term ''cellulosic biofuel'' means renewable fuel derived from any cellulose, hemicellulose, or lignin that is derived from

renewable biomass and that has lifecycle greenhouse gas emissions, as determined by the Administrator, that are at least 60 percent less than the baseline lifecycle greenhouse gas emissions.

**(F) Conventional biofuel**

The term ''conventional biofuel'' means renewable fuel that is ethanol derived from corn starch.

**(G) Greenhouse gas**

The term ''greenhouse gas'' means carbon dioxide, hydrofluorocarbons, methane, nitrous oxide, perfluorocarbons,[9] sulfur hexafluoride. The Administrator may include any other anthropogenically-emitted gas that is determined by the Administrator, after notice and comment, to contribute to global warming.

**(H) Lifecycle greenhouse gas emissions**

The term ''lifecycle greenhouse gas emissions'' means the aggregate quantity of greenhouse gas emissions (including direct emissions and significant indirect emissions such as significant emissions from land use changes), as determined by the Administrator, related to the full fuel lifecycle, including all stages of fuel and feedstock production and distribution, from feedstock generation or extraction through the distribution and delivery and use of the finished fuel to the ultimate consumer, where the mass values for all greenhouse gases are adjusted to account for their relative global warming potential.

**(I) Renewable biomass**

The term ''renewable biomass'' means each of the following:

(i) Planted crops and crop residue harvested from agricultural land cleared or cultivated at any time prior to December 19, 2007, that is either actively managed or fallow, and nonforested.

(ii) Planted trees and tree residue from actively managed tree plantations on non-federal[10] land cleared at any time prior to December 19, 2007, including land belonging to an Indian tribe or an Indian individual, that is held in trust by the United States or subject to a restriction against alienation imposed by the United States.

(iii) Animal waste material and animal byproducts.

(iv) Slash and pre-commercial thinnings that are from non-federal[10] forestlands, including forestlands belonging to an Indian tribe or an Indian individual, that are held in trust by the United States or subject to a restriction against alienation imposed by the United States, but not forests or forestlands that are ecological communities with a global or State ranking of critically imperiled, imperiled, or rare pursuant to a State Natural Heritage Program, old growth forest, or late successional forest.

(v) Biomass obtained from the immediate vicinity of buildings and other areas regularly occupied by people, or of public infrastructure, at risk from wildfire.

(vi) Algae.

(vii) Separated yard waste or food waste, including recycled cooking and trap grease.

**(J) Renewable fuel**

The term ''renewable fuel'' means fuel that is produced from renewable biomass and that is used to replace or reduce the quantity of fossil fuel present in a transportation fuel.

**(K) Small refinery**

The term ''small refinery'' means a refinery for which the average aggregate daily crude oil throughput for a calendar year (as determined by dividing the aggregate throughput for the calendar year by the number of days in the calendar year) does not exceed 75,000 barrels.

**(L) Transportation fuel**

The term ''transportation fuel'' means fuel for use in motor vehicles, motor vehicle engines, nonroad vehicles, or nonroad engines (except for ocean-going vessels).

**(2) Renewable fuel program**

**(A) Regulations**

**(i) In general**

Not later than 1 year after August 8, 2005, the Administrator shall promulgate regulations to ensure that gasoline sold or introduced into commerce in the United States (except in noncontiguous States or territories), on an annual average basis, contains the applicable volume of renewable fuel determined in accordance with subparagraph (B). Not later than 1 year after December 19, 2007, the Administrator shall revise the regulations under this paragraph to ensure that transportation fuel sold or introduced into commerce in the United States (except in noncontiguous States or territories), on an annual average basis, contains at least the applicable volume of renewable fuel, advanced biofuel, cellulosic biofuel, and biomass-based diesel, determined in accordance with subparagraph (B) and, in the case of any such renewable fuel produced from new facilities that commence construction after December 19, 2007, achieves at least a 20 percent reduction in lifecycle greenhouse gas emissions compared to baseline lifecycle greenhouse gas emissions.

**(ii) Noncontiguous State opt-in**

**(I) In general**

On the petition of a noncontiguous State or territory, the Administrator may allow the renewable fuel program established under this subsection to apply in the noncontiguous State or territory at the same time or any time after the Administrator promulgates regulations under this subparagraph.

**(II) Other actions**

In carrying out this clause, the Administrator may—

---

[9] So in original. The word ''and'' probably should appear.

[10] So in original. Probably should be ''non-Federal''.

(aa) issue or revise regulations under this paragraph;

(bb) establish applicable percentages under paragraph (3);

(cc) provide for the generation of credits under paragraph (5); and

(dd) take such other actions as are necessary to allow for the application of the renewable fuels program in a noncontiguous State or territory.

### (iii) Provisions of regulations

Regardless of the date of promulgation, the regulations promulgated under clause (i)—

(I) shall contain compliance provisions applicable to refineries, blenders, distributors, and importers, as appropriate, to ensure that the requirements of this paragraph are met; but

(II) shall not—

(aa) restrict geographic areas in which renewable fuel may be used; or

(bb) impose any per-gallon obligation for the use of renewable fuel.

### (iv) Requirement in case of failure to promulgate regulations

If the Administrator does not promulgate regulations under clause (i), the percentage of renewable fuel in gasoline sold or dispensed to consumers in the United States, on a volume basis, shall be 2.78 percent for calendar year 2006.

### (B) Applicable volumes

### (i) Calendar years after 2005

### (I) Renewable fuel

For the purpose of subparagraph (A), the applicable volume of renewable fuel for the calendar years 2006 through 2022 shall be determined in accordance with the following table:

| Calendar year: | Applicable volume of renewable fuel (in billions of gallons): |
|---|---|
| 2006 | 4.0 |
| 2007 | 4.7 |
| 2008 | 9.0 |
| 2009 | 11.1 |
| 2010 | 12.95 |
| 2011 | 13.95 |
| 2012 | 15.2 |
| 2013 | 16.55 |
| 2014 | 18.15 |
| 2015 | 20.5 |
| 2016 | 22.25 |
| 2017 | 24.0 |
| 2018 | 26.0 |
| 2019 | 28.0 |
| 2020 | 30.0 |
| 2021 | 33.0 |
| 2022 | 36.0 |

### (II) Advanced biofuel

For the purpose of subparagraph (A), of the volume of renewable fuel required under subclause (I), the applicable volume of advanced biofuel for the calendar years 2009 through 2022 shall be determined in accordance with the following table:

| Calendar year: | Applicable volume of advanced biofuel (in billions of gallons): |
|---|---|
| 2009 | 0.6 |
| 2010 | 0.95 |
| 2011 | 1.35 |
| 2012 | 2.0 |
| 2013 | 2.75 |
| 2014 | 3.75 |
| 2015 | 5.5 |
| 2016 | 7.25 |
| 2017 | 9.0 |
| 2018 | 11.0 |
| 2019 | 13.0 |
| 2020 | 15.0 |
| 2021 | 18.0 |
| 2022 | 21.0 |

### (III) Cellulosic biofuel

For the purpose of subparagraph (A), of the volume of advanced biofuel required under subclause (II), the applicable volume of cellulosic biofuel for the calendar years 2010 through 2022 shall be determined in accordance with the following table:

| Calendar year: | Applicable volume of cellulosic biofuel (in billions of gallons): |
|---|---|
| 2010 | 0.1 |
| 2011 | 0.25 |
| 2012 | 0.5 |
| 2013 | 1.0 |
| 2014 | 1.75 |
| 2015 | 3.0 |
| 2016 | 4.25 |
| 2017 | 5.5 |
| 2018 | 7.0 |
| 2019 | 8.5 |
| 2020 | 10.5 |
| 2021 | 13.5 |
| 2022 | 16.0 |

### (IV) Biomass-based diesel

For the purpose of subparagraph (A), of the volume of advanced biofuel required under subclause (II), the applicable volume of biomass-based diesel for the calendar years 2009 through 2012 shall be determined in accordance with the following table:

| Calendar year: | Applicable volume of biomass-based diesel (in billions of gallons): |
|---|---|
| 2009 | 0.5 |
| 2010 | 0.65 |
| 2011 | 0.80 |
| 2012 | 1.0 |

### (ii) Other calendar years

For the purposes of subparagraph (A), the applicable volumes of each fuel specified in the tables in clause (i) for calendar

A3

years after the calendar years specified in the tables shall be determined by the Administrator, in coordination with the Secretary of Energy and the Secretary of Agriculture, based on a review of the implementation of the program during calendar years specified in the tables, and an analysis of—

(I) the impact of the production and use of renewable fuels on the environment, including on air quality, climate change, conversion of wetlands, ecosystems, wildlife habitat, water quality, and water supply;

(II) the impact of renewable fuels on the energy security of the United States;

(III) the expected annual rate of future commercial production of renewable fuels, including advanced biofuels in each category (cellulosic biofuel and biomass-based diesel);

(IV) the impact of renewable fuels on the infrastructure of the United States, including deliverability of materials, goods, and products other than renewable fuel, and the sufficiency of infrastructure to deliver and use renewable fuel;

(V) the impact of the use of renewable fuels on the cost to consumers of transportation fuel and on the cost to transport goods; and

(VI) the impact of the use of renewable fuels on other factors, including job creation, the price and supply of agricultural commodities, rural economic development, and food prices.

The Administrator shall promulgate rules establishing the applicable volumes under this clause no later than 14 months before the first year for which such applicable volume will apply.

**(iii) Applicable volume of advanced biofuel**

For the purpose of making the determinations in clause (ii), for each calendar year, the applicable volume of advanced biofuel shall be at least the same percentage of the applicable volume of renewable fuel as in calendar year 2022.

**(iv) Applicable volume of cellulosic biofuel**

For the purpose of making the determinations in clause (ii), for each calendar year, the applicable volume of cellulosic biofuel established by the Administrator shall be based on the assumption that the Administrator will not need to issue a waiver for such years under paragraph (7)(D).

**(v) Minimum applicable volume of biomass-based diesel**

For the purpose of making the determinations in clause (ii), the applicable volume of biomass-based diesel shall not be less than the applicable volume listed in clause (i)(IV) for calendar year 2012.

**(3) Applicable percentages**

**(A) Provision of estimate of volumes of gasoline sales**

Not later than October 31 of each of calendar years 2005 through 2021, the Adminis-

trator of the Energy Information Administration shall provide to the Administrator of the Environmental Protection Agency an estimate, with respect to the following calendar year, of the volumes of transportation fuel, biomass-based diesel, and cellulosic biofuel projected to be sold or introduced into commerce in the United States.

**(B) Determination of applicable percentages**

**(i) In general**

Not later than November 30 of each of calendar years 2005 through 2021, based on the estimate provided under subparagraph (A), the Administrator of the Environmental Protection Agency shall determine and publish in the Federal Register, with respect to the following calendar year, the renewable fuel obligation that ensures that the requirements of paragraph (2) are met.

**(ii) Required elements**

The renewable fuel obligation determined for a calendar year under clause (i) shall—

(I) be applicable to refineries, blenders, and importers, as appropriate;

(II) be expressed in terms of a volume percentage of transportation fuel sold or introduced into commerce in the United States; and

(III) subject to subparagraph (C)(i), consist of a single applicable percentage that applies to all categories of persons specified in subclause (I).

**(C) Adjustments**

In determining the applicable percentage for a calendar year, the Administrator shall make adjustments—

(i) to prevent the imposition of redundant obligations on any person specified in subparagraph (B)(ii)(I); and

(ii) to account for the use of renewable fuel during the previous calendar year by small refineries that are exempt under paragraph (9).

**(4) Modification of greenhouse gas reduction percentages**

**(A) In general**

The Administrator may, in the regulations under the last sentence of paragraph (2)(A)(i), adjust the 20 percent, 50 percent, and 60 percent reductions in lifecycle greenhouse gas emissions specified in paragraphs (2)(A)(i) (relating to renewable fuel), (1)(D) (relating to biomass-based diesel), (1)(B)(i) (relating to advanced biofuel), and (1)(E) (relating to cellulosic biofuel) to a lower percentage. For the 50 and 60 percent reductions, the Administrator may make such an adjustment only if he determines that generally such reduction is not commercially feasible for fuels made using a variety of feedstocks, technologies, and processes to meet the applicable reduction.

**(B) Amount of adjustment**

In promulgating regulations under this paragraph, the specified 50 percent reduction

in greenhouse gas emissions from advanced biofuel and in biomass-based diesel may not be reduced below 40 percent. The specified 20 percent reduction in greenhouse gas emissions from renewable fuel may not be reduced below 10 percent, and the specified 60 percent reduction in greenhouse gas emissions from cellulosic biofuel may not be reduced below 50 percent.

**(C) Adjusted reduction levels**

An adjustment under this paragraph to a percent less than the specified 20 percent greenhouse gas reduction for renewable fuel shall be the minimum possible adjustment, and the adjusted greenhouse gas reduction shall be established by the Administrator at the maximum achievable level, taking cost in consideration, for natural gas fired corn-based ethanol plants, allowing for the use of a variety of technologies and processes. An adjustment in the 50 or 60 percent greenhouse gas levels shall be the minimum possible adjustment for the fuel or fuels concerned, and the adjusted greenhouse gas reduction shall be established at the maximum achievable level, taking cost in consideration, allowing for the use of a variety of feedstocks, technologies, and processes.

**(D) 5-year review**

Whenever the Administrator makes any adjustment under this paragraph, not later than 5 years thereafter he shall review and revise (based upon the same criteria and standards as required for the initial adjustment) the regulations establishing the adjusted level.

**(E) Subsequent adjustments**

After the Administrator has promulgated a final rule under the last sentence of paragraph (2)(A)(i) with respect to the method of determining lifecycle greenhouse gas emissions, except as provided in subparagraph (D), the Administrator may not adjust the percent greenhouse gas reduction levels unless he determines that there has been a significant change in the analytical methodology used for determining the lifecycle greenhouse gas emissions. If he makes such determination, he may adjust the 20, 50, or 60 percent reduction levels through rulemaking using the criteria and standards set forth in this paragraph.

**(F) Limit on upward adjustments**

If, under subparagraph (D) or (E), the Administrator revises a percent level adjusted as provided in subparagraphs (A), (B), and (C) to a higher percent, such higher percent may not exceed the applicable percent specified in paragraph (2)(A)(i), (1)(D), (1)(B)(i), or (1)(E).

**(G) Applicability of adjustments**

If the Administrator adjusts, or revises, a percent level referred to in this paragraph or makes a change in the analytical methodology used for determining the lifecycle greenhouse gas emissions, such adjustment, revision, or change (or any combination thereof) shall only apply to renewable fuel from new facilities that commence construction after the effective date of such adjustment, revision, or change.

**(5) Credit program**

**(A) In general**

The regulations promulgated under paragraph (2)(A) shall provide—

(i) for the generation of an appropriate amount of credits by any person that refines, blends, or imports gasoline that contains a quantity of renewable fuel that is greater than the quantity required under paragraph (2);

(ii) for the generation of an appropriate amount of credits for biodiesel; and

(iii) for the generation of credits by small refineries in accordance with paragraph (9)(C).

**(B) Use of credits**

A person that generates credits under subparagraph (A) may use the credits, or transfer all or a portion of the credits to another person, for the purpose of complying with paragraph (2).

**(C) Duration of credits**

A credit generated under this paragraph shall be valid to show compliance for the 12 months as of the date of generation.

**(D) Inability to generate or purchase sufficient credits**

The regulations promulgated under paragraph (2)(A) shall include provisions allowing any person that is unable to generate or purchase sufficient credits to meet the requirements of paragraph (2) to carry forward a renewable fuel deficit on condition that the person, in the calendar year following the year in which the renewable fuel deficit is created—

(i) achieves compliance with the renewable fuel requirement under paragraph (2); and

(ii) generates or purchases additional renewable fuel credits to offset the renewable fuel deficit of the previous year.

**(E) Credits for additional renewable fuel**

The Administrator may issue regulations providing: (i) for the generation of an appropriate amount of credits by any person that refines, blends, or imports additional renewable fuels specified by the Administrator; and (ii) for the use of such credits by the generator, or the transfer of all or a portion of the credits to another person, for the purpose of complying with paragraph (2).

**(6) Seasonal variations in renewable fuel use**

**(A) Study**

For each of calendar years 2006 through 2012, the Administrator of the Energy Information Administration shall conduct a study of renewable fuel blending to determine whether there are excessive seasonal variations in the use of renewable fuel.

**(B) Regulation of excessive seasonal variations**

If, for any calendar year, the Administrator of the Energy Information Adminis-

tration, based on the study under subparagraph (A), makes the determinations specified in subparagraph (C), the Administrator of the Environmental Protection Agency shall promulgate regulations to ensure that 25 percent or more of the quantity of renewable fuel necessary to meet the requirements of paragraph (2) is used during each of the 2 periods specified in subparagraph (D) of each subsequent calendar year.

### (C) Determinations

The determinations referred to in subparagraph (B) are that—

(i) less than 25 percent of the quantity of renewable fuel necessary to meet the requirements of paragraph (2) has been used during 1 of the 2 periods specified in subparagraph (D) of the calendar year;

(ii) a pattern of excessive seasonal variation described in clause (i) will continue in subsequent calendar years; and

(iii) promulgating regulations or other requirements to impose a 25 percent or more seasonal use of renewable fuels will not prevent or interfere with the attainment of national ambient air quality standards or significantly increase the price of motor fuels to the consumer.

### (D) Periods

The 2 periods referred to in this paragraph are—

(i) April through September; and

(ii) January through March and October through December.

### (E) Exclusion

Renewable fuel blended or consumed in calendar year 2006 in a State that has received a waiver under section 7543(b) of this title shall not be included in the study under subparagraph (A).

### (F) State exemption from seasonality requirements

Notwithstanding any other provision of law, the seasonality requirement relating to renewable fuel use established by this paragraph shall not apply to any State that has received a waiver under section 7543(b) of this title or any State dependent on refineries in such State for gasoline supplies.

## (7) Waivers

### (A) In general

The Administrator, in consultation with the Secretary of Agriculture and the Secretary of Energy, may waive the requirements of paragraph (2) in whole or in part on petition by one or more States, by any person subject to the requirements of this subsection, or by the Administrator on his own motion by reducing the national quantity of renewable fuel required under paragraph (2)—

(i) based on a determination by the Administrator, after public notice and opportunity for comment, that implementation of the requirement would severely harm the economy or environment of a State, a region, or the United States; or

(ii) based on a determination by the Administrator, after public notice and opportunity for comment, that there is an inadequate domestic supply.

### (B) Petitions for waivers

The Administrator, in consultation with the Secretary of Agriculture and the Secretary of Energy, shall approve or disapprove a petition for a waiver of the requirements of paragraph (2) within 90 days after the date on which the petition is received by the Administrator.

### (C) Termination of waivers

A waiver granted under subparagraph (A) shall terminate after 1 year, but may be renewed by the Administrator after consultation with the Secretary of Agriculture and the Secretary of Energy.

### (D) Cellulosic biofuel

(i) For any calendar year for which the projected volume of cellulosic biofuel production is less than the minimum applicable volume established under paragraph (2)(B), as determined by the Administrator based on the estimate provided under paragraph (3)(A), not later than November 30 of the preceding calendar year, the Administrator shall reduce the applicable volume of cellulosic biofuel required under paragraph (2)(B) to the projected volume available during that calendar year. For any calendar year in which the Administrator makes such a reduction, the Administrator may also reduce the applicable volume of renewable fuel and advanced biofuels requirement established under paragraph (2)(B) by the same or a lesser volume.

(ii) Whenever the Administrator reduces the minimum cellulosic biofuel volume under this subparagraph, the Administrator shall make available for sale cellulosic biofuel credits at the higher of $0.25 per gallon or the amount by which $3.00 per gallon exceeds the average wholesale price of a gallon of gasoline in the United States. Such amounts shall be adjusted for inflation by the Administrator for years after 2008.

(iii) Eighteen months after December 19, 2007, the Administrator shall promulgate regulations to govern the issuance of credits under this subparagraph. The regulations shall set forth the method for determining the exact price of credits in the event of a waiver. The price of such credits shall not be changed more frequently than once each quarter. These regulations shall include such provisions, including limiting the credits' uses and useful life, as the Administrator deems appropriate to assist market liquidity and transparency, to provide appropriate certainty for regulated entities and renewable fuel producers, and to limit any potential misuse of cellulosic biofuel credits to reduce the use of other renewable fuels, and for such other purposes as the Administrator determines will help achieve the goals of this subsection. The regulations shall limit the number of cellulosic biofuel credits for any calendar year to the minimum appli-

cable volume (as reduced under this subparagraph) of cellulosic biofuel for that year.

**(E) Biomass-based diesel**

**(i) Market evaluation**

The Administrator, in consultation with the Secretary of Energy and the Secretary of Agriculture, shall periodically evaluate the impact of the biomass-based diesel requirements established under this paragraph on the price of diesel fuel.

**(ii) Waiver**

If the Administrator determines that there is a significant renewable feedstock disruption or other market circumstances that would make the price of biomass-based diesel fuel increase significantly, the Administrator, in consultation with the Secretary of Energy and the Secretary of Agriculture, shall issue an order to reduce, for up to a 60-day period, the quantity of biomass-based diesel required under subparagraph (A) by an appropriate quantity that does not exceed 15 percent of the applicable annual requirement for biomass-based diesel. For any calendar year in which the Administrator makes a reduction under this subparagraph, the Administrator may also reduce the applicable volume of renewable fuel and advanced biofuels requirement established under paragraph (2)(B) by the same or a lesser volume.

**(iii) Extensions**

If the Administrator determines that the feedstock disruption or circumstances described in clause (ii) is continuing beyond the 60-day period described in clause (ii) or this clause, the Administrator, in consultation with the Secretary of Energy and the Secretary of Agriculture, may issue an order to reduce, for up to an additional 60-day period, the quantity of biomass-based diesel required under subparagraph (A) by an appropriate quantity that does not exceed an additional 15 percent of the applicable annual requirement for biomass-based diesel.

**(F) Modification of applicable volumes**

For any of the tables in paragraph (2)(B), if the Administrator waives—

(i) at least 20 percent of the applicable volume requirement set forth in any such table for 2 consecutive years; or

(ii) at least 50 percent of such volume requirement for a single year,

the Administrator shall promulgate a rule (within 1 year after issuing such waiver) that modifies the applicable volumes set forth in the table concerned for all years following the final year to which the waiver applies, except that no such modification in applicable volumes shall be made for any year before 2016. In promulgating such a rule, the Administrator shall comply with the processes, criteria, and standards set forth in paragraph (2)(B)(ii).

**(8) Study and waiver for initial year of program**

**(A) In general**

Not later than 180 days after August 8, 2005, the Secretary of Energy shall conduct for the Administrator a study assessing whether the renewable fuel requirement under paragraph (2) will likely result in significant adverse impacts on consumers in 2006, on a national, regional, or State basis.

**(B) Required evaluations**

The study shall evaluate renewable fuel—
(i) supplies and prices;
(ii) blendstock supplies; and
(iii) supply and distribution system capabilities.

**(C) Recommendations by the Secretary**

Based on the results of the study, the Secretary of Energy shall make specific recommendations to the Administrator concerning waiver of the requirements of paragraph (2), in whole or in part, to prevent any adverse impacts described in subparagraph (A).

**(D) Waiver**

**(i) In general**

Not later than 270 days after August 8, 2005, the Administrator shall, if and to the extent recommended by the Secretary of Energy under subparagraph (C), waive, in whole or in part, the renewable fuel requirement under paragraph (2) by reducing the national quantity of renewable fuel required under paragraph (2) in calendar year 2006.

**(ii) No effect on waiver authority**

Clause (i) does not limit the authority of the Administrator to waive the requirements of paragraph (2) in whole, or in part, under paragraph (7).

**(9) Small refineries**

**(A) Temporary exemption**

**(i) In general**

The requirements of paragraph (2) shall not apply to small refineries until calendar year 2011.

**(ii) Extension of exemption**

**(I) Study by Secretary of Energy**

Not later than December 31, 2008, the Secretary of Energy shall conduct for the Administrator a study to determine whether compliance with the requirements of paragraph (2) would impose a disproportionate economic hardship on small refineries.

**(II) Extension of exemption**

In the case of a small refinery that the Secretary of Energy determines under subclause (I) would be subject to a disproportionate economic hardship if required to comply with paragraph (2), the Administrator shall extend the exemption under clause (i) for the small refinery for a period of not less than 2 additional years.

**(B) Petitions based on disproportionate economic hardship**

**(i) Extension of exemption**

A small refinery may at any time petition the Administrator for an extension of the exemption under subparagraph (A) for the reason of disproportionate economic hardship.

**(ii) Evaluation of petitions**

In evaluating a petition under clause (i), the Administrator, in consultation with the Secretary of Energy, shall consider the findings of the study under subparagraph (A)(ii) and other economic factors.

**(iii) Deadline for action on petitions**

The Administrator shall act on any petition submitted by a small refinery for a hardship exemption not later than 90 days after the date of receipt of the petition.

**(C) Credit program**

If a small refinery notifies the Administrator that the small refinery waives the exemption under subparagraph (A), the regulations promulgated under paragraph (2)(A) shall provide for the generation of credits by the small refinery under paragraph (5) beginning in the calendar year following the date of notification.

**(D) Opt-in for small refineries**

A small refinery shall be subject to the requirements of paragraph (2) if the small refinery notifies the Administrator that the small refinery waives the exemption under subparagraph (A).

**(10) Ethanol market concentration analysis**

**(A) Analysis**

**(i) In general**

Not later than 180 days after August 8, 2005, and annually thereafter, the Federal Trade Commission shall perform a market concentration analysis of the ethanol production industry using the Herfindahl-Hirschman Index to determine whether there is sufficient competition among industry participants to avoid price-setting and other anticompetitive behavior.

**(ii) Scoring**

For the purpose of scoring under clause (i) using the Herfindahl-Hirschman Index, all marketing arrangements among industry participants shall be considered.

**(B) Report**

Not later than December 1, 2005, and annually thereafter, the Federal Trade Commission shall submit to Congress and the Administrator a report on the results of the market concentration analysis performed under subparagraph (A)(i).

**(11) Periodic reviews**

To allow for the appropriate adjustment of the requirements described in subparagraph (B) of paragraph (2), the Administrator shall conduct periodic reviews of—

(A) existing technologies;

(B) the feasibility of achieving compliance with the requirements; and

(C) the impacts of the requirements described in subsection (a)(2)[11] on each individual and entity described in paragraph (2).

**(12) Effect on other provisions**

Nothing in this subsection, or regulations issued pursuant to this subsection, shall affect or be construed to affect the regulatory status of carbon dioxide or any other greenhouse gas, or to expand or limit regulatory authority regarding carbon dioxide or any other greenhouse gas, for purposes of other provisions (including section 7475) of this chapter. The previous sentence shall not affect implementation and enforcement of this subsection.

**(q)[12] Analyses of motor vehicle fuel changes and emissions model**

**(1) Anti-backsliding analysis**

**(A) Draft analysis**

Not later than 4 years after August 8, 2005, the Administrator shall publish for public comment a draft analysis of the changes in emissions of air pollutants and air quality due to the use of motor vehicle fuel and fuel additives resulting from implementation of the amendments made by the Energy Policy Act of 2005.

**(B) Final analysis**

After providing a reasonable opportunity for comment but not later than 5 years after August 8, 2005, the Administrator shall publish the analysis in final form.

**(2) Emissions model**

For the purposes of this section, not later than 4 years after August 8, 2005, the Administrator shall develop and finalize an emissions model that reflects, to the maximum extent practicable, the effects of gasoline characteristics or components on emissions from vehicles in the motor vehicle fleet during calendar year 2007.

**(3) Permeation effects study**

**(A) In general**

Not later than 1 year after August 8, 2005, the Administrator shall conduct a study, and report to Congress the results of the study, on the effects of ethanol content in gasoline on permeation, the process by which fuel molecules migrate through the elastomeric materials (rubber and plastic parts) that make up the fuel and fuel vapor systems of a motor vehicle.

**(B) Evaporative emissions**

The study shall include estimates of the increase in total evaporative emissions likely to result from the use of gasoline with ethanol content in a motor vehicle, and the fleet of motor vehicles, due to permeation.

**(r) Fuel and fuel additive importers and importation**

For the purposes of this section, the term ''manufacturer'' includes an importer and the term ''manufacture'' includes importation.

---

[11] So in original. Subsection (a) does not contain a par. (2).

[12] So in original. No subsec. (p) has been enacted.

**Environmental Protection Agency**                                    **§ 80.1456**

(3) Records related to the volume of MVNRLM diesel fuel received.

(4) Records related to the volume of MVNRLM diesel fuel delivered.

(5) Records related to the volume of certified NTDF received.

(6) Records related to the volume of certified NTDF delivered.

(p) *Requirements for recordkeeping of RIN holdings for all parties transacting or owning RINs.* (1) Starting January 1, 2020, parties must retain records related to end-of-day separated D6 RIN holdings, and any associated calculations recorded in order to meet the RIN holdings requirements described in § 80.1435 for a period of at least five years. Such records must include information related to any corporate affiliates, contractual affiliates, and their RIN holdings and calculations.

(2) Parties must retain records related to their reports to EPA regarding threshold compliance under §§ 80.1435 and 80.1451 for a period of at least five years.

(q) *Requirements for recordkeeping of contractual and corporate affiliates.* (1) Parties must retain records including, but not limited to, the name, address, business location, contact information, and description of relationship, for each RIN-holding corporate affiliate for a period of at least five years. For the corporate affiliate group, a relational diagram.

(2) Parties must retain records including, but not limited to, the name, address, business location, contact information, and contract or other agreement for each contractual affiliate for a period of at least five years.

(3) If a party claims an exemption from aggregation under § 80.1435(e), the party must retain all records in support of the exemption for a period of at least five years and must provide these records to the attest auditor under § 80.1464, and to EPA upon request.

(r) *Transaction requirement.* Beginning July 1, 2010, all parties must keep transaction information sent to EMTS in addition to other records required under this section.

(1) For buy or sell transactions of separated RINs, parties must retain records substantiating the price reported to EPA under § 80.1452.

(2) For buy or sell transactions of separated RINs on or after January 1, 2020, parties must retain records demonstrating the transaction mechanism (*e.g.*, spot market or fulfilling a term contract).

(s) *Record retention requirement.* (1) The records required under paragraphs (a) through (d), (f) through (l), (n), and (r) of this section and under § 80.1453 must be kept for five years from the date they were created, except that records related to transactions involving RINs must be kept for five years from the date of the RIN transaction.

(2) The records required under paragraph (e) of this section must be kept through calendar year 2022.

(t) *Record availability requirement.* On request by the EPA, the records required under this section and under § 80.1453 must be made available to EPA. For records that are electronically generated or maintained, the equipment or software necessary to read the records shall be made available; or, if requested by the EPA, electronic records shall be converted to paper documents.

(u) *Record transfer requirement.* The records required in paragraphs (b)(3) and (c)(1) of this section must be transferred with any renewable fuel sent to the importer of that renewable fuel by any non-RIN-generating foreign producer.

(v) *English language records.* Any document requested by EPA under this section must be submitted in English or must include an English translation.

[75 FR 14863, Mar. 26, 2010, as amended at 75 FR 26046, May 10, 2010; 75 FR 76829, Dec. 9, 2010; 75 FR 79978, Dec. 21, 2010; 77 FR 74606, Dec. 17, 2012; 78 FR 22789, Apr. 17, 2013; 78 FR 41715, July 11, 2013; 78 FR 62471, Oct. 22, 2013; 79 FR 42118, 42165, July 18, 2014; 84 FR 27024, June 10, 2019; 85 FR 7080, Feb. 6, 2020; 85 FR 78467, Dec. 4, 2020; 87 FR 39670, July 1, 2022; 87 FR 54166, Sept. 2, 2022; 88 FR 44589, July 12, 2023]

**§ 80.1455   [Reserved]**

**§ 80.1456   What are the provisions for cellulosic biofuel waiver credits?**

(a) If EPA reduces the applicable volume of cellulosic biofuel pursuant to section 211(o)(7)(D)(i) of the Clean Air Act (42 U.S.C. 7545(o)(7)(D)(i)) for any given compliance year, then EPA will

227

A9

provide cellulosic biofuel waiver credits for purchase for that compliance year.

(1) The price of these cellulosic biofuel waiver credits will be set by EPA on an annual basis in accordance with paragraph (d) of this section.

(2) The total cellulosic biofuel waiver credits available will be equal to the reduced cellulosic biofuel volume established by EPA for the compliance year.

(b) *Use of cellulosic biofuel waiver credits.* (1) Cellulosic biofuel waiver credits are only valid for use in the compliance year that they are made available.

(2) Cellulosic biofuel waiver credits are nonrefundable.

(3) Cellulosic biofuel waiver credits are nontransferable.

(4) Cellulosic biofuel waiver credits may only be used for an obligated party's current year cellulosic biofuel RVO and not towards any prior year deficit cellulosic biofuel volume obligations.

(c) *Purchase of cellulosic biofuel waiver credits.* (1) Only parties with an RVO for cellulosic biofuel may purchase cellulosic biofuel waiver credits.

(2) Cellulosic biofuel waiver credits shall be purchased from EPA at the time that a party submits its annual compliance report to EPA pursuant to § 80.1451(a)(1).

(3) Parties may not purchase more cellulosic biofuel waiver credits than their current year cellulosic biofuel RVO minus cellulosic biofuel RINs with a D code of 3 that they own.

(4) Cellulosic biofuel waiver credits may only be used to meet an obligated party's cellulosic biofuel RVO.

(d) *Setting the price of cellulosic biofuel waiver credits.* (1) The price for cellulosic biofuel waiver credits shall be set equal to the greater of:

(i) $0.25 per cellulosic biofuel waiver credit, adjusted for inflation in comparison to calendar year 2008; or

(ii) $3.00 less the wholesale price of gasoline per cellulosic biofuel waiver credit, adjusted for inflation in comparison to calendar year 2008.

(2) The wholesale price of gasoline will be calculated by averaging the most recent twelve monthly values for U.S. Total Gasoline Bulk Sales (Price) by Refiners as provided by the Energy Information Administration that are available as of September 30 of the year preceding the compliance period.

(3) The inflation adjustment will be calculated by comparing the Consumer Price Index for All Urban Consumers (CPI–U): U.S. City Average, Unadjusted Index for All Items expenditure category as provided by the Bureau of Labor Statistics for June of the year preceding the compliance period to the comparable value reported for January 2009.

(e) Cellulosic biofuel waiver credits under this section will only be able to be purchased on forms and following procedures prescribed by EPA.

[75 FR 14863, Mar. 26, 2010, as amended at 80 FR 18141, Apr. 3, 2015]

§ 80.1457 **Petition process for aggregate compliance approach for foreign countries.**

(a) EPA may approve a petition for application of the aggregate compliance approach to planted crops and crop residue from existing agricultural land in a foreign country if EPA determines that an aggregate compliance approach will provide reasonable assurance that planted crops and crop residue from the country in question meet the definition of renewable biomass and will continue to meet the definition of renewable biomass, based on the submission of credible, reliable, and verifiable data.

(1) As part of its evaluation, EPA will consider all of the following:

(i) Whether there has been a reasonable identification of the "2007 baseline area of land," defined as the total amount of cropland, pastureland, and land that is equivalent to U.S. Conservation Reserve Program land in the country in question that was actively managed or fallow and nonforested on December 19, 2007.

(ii) Whether information on the total amount of cropland, pastureland, and land that is equivalent to U.S. Conservation Reserve Program land in the country in question for years preceding and following calendar year 2007 shows that the 2007 baseline area of land identified in paragraph (a)(1)(i) of this section is not likely to be exceeded in the future.